## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SPITERI, derivatively on behalf of VIRGIN GALACTIC HOLDINGS, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| RICHARD BRANSON, CHAMATH PALIHAPITIYA, MICHAEL MOSES, GEORGE WHITESIDES, MICHAEL COLGLAZIER, WANDA AUSTIN, ADAM BAIN, TINA JONAS, CRAIG KREEGER, EVAN LOVELL, GEORGE MATTSON, JAMES RYANS, W. GILBERT WEST, ANTHONY BATES, IAN OSBORNE, JACQUELINE D. RESES, and ANDREA WONG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| VIRGIN GALACTIC HOLDINGS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Thomas Spiteri ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company") f/k/a Social Capital Hedosophia Holdings Corp. ("SCH" or the "Company")[1], files this Verified Shareholder Derivative Complaint against Individual Defendants Richard Branson ("Branson"), Chamath Palihapitiya ("Palihapitiya"), Michael Moses ("Moses"), George

---

[1] "Virgin Galactic" refers to the "Company" after the October 2019 merger (the "Merger") and name change, whereas "SCH" refers to the "Company" prior to the Merger and name change.

Whitesides ("Whitesides"), Michael Colglazier ("Colglazier"), Wanda Austin ("Austin"), Adam Bain ("Bain"), Tina Jonas ("Jonas"), Craig Kreeger ("Kreeger"), Evan Lovell ("Lovell"), George Mattson ("Mattson"), James Ryans ("Ryans"), W. Gilbert West ("West"), Anthony Bates ("Bates"), Ian Osborne ("Osborne"), Jacqueline D. Reses ("Reses"), and Andrea Wong ("Wong"), (collectively, the "Individual Defendants," and together with Virgin Galactic, the "Defendants") for breaches of their fiduciary duties as current and/or former controlling shareholder, directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Branson, Moses, and Whitesides (collectively, the "Legacy VG Defendants") for aiding and abetting certain breaches of fiduciary duty by Defendants Palihapitiya, Bain, Bates, Osborne, Reses, Ryans, and Wong (collectively, the "SCH Defendants"); against the Individual Defendants—except Defendant Moses—for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 10, 2019 through October 14, 2021 (the "Relevant Period").

2.       Virgin Galactic is an aerospace company that is attempting to pioneer space travel for private individuals and researchers, *i.e.*, it is a space tourism company. Virgin Galactic both conducts space flights and manufactures space-faring vehicles and components for them.

3.       Defendant Branson owns the "Virgin" brand and its name appears across many entities he is affiliated with, including the cellphone company Virgin Mobile and the airline Virgin Atlantic.

4.       SCH was founded as a special purpose acquisition company ("SPAC") in 2017. SCH's initial public offering ("IPO") closed on or about September 18, 2017, after which it began the process of looking for a company to merge with.

5.       Prior to the Merger, Vieco 10 Limited ("Vieco") was the holding company that held Virgin Galactic Vehicle Holdings, Inc. and other affiliated subsidiaries (collectively, "Legacy VG") that served as the operational predecessor of Virgin Galactic. Vieco owned Legacy VG through its subsidiary, Vieco USA, Inc. ("Vieco US").

6.       Legacy VG was founded in 2004 as a joint venture with manufacturer Scaled Composites. Prior to the Relevant Period, Legacy VG had developed designs for two prototype aerospace vehicles: Eve and Unity. As described below, these prototype vehicles and their design drawings were severely flawed and nowhere near flightworthy. In fact, the prototypes were not meant to be taken into the air. Rather, they were meant to provide a starting design point for the Company to create its own commercial-grade vehicle that was safe and flightworthy—two things Eve and Unity certainly were not.

7.      Eve is an aircraft that flies to approximately 45,000 feet above the Earth before releasing Unity, which then ignites its own rockets to complete the journey into space. Prior to the Merger, Eve and Unity had purportedly conducted two successful test flights into space, along with other atmospheric test flights. The most recent test spaceflight occurred in February 2019. Unbeknownst at the time, the entire crew was almost killed due to a mechanical issue caused by human error, but this went undisclosed at the time.

8.      While Legacy VG touted its spaceflights as resounding successes, the reality was that Eve and Unity were very rudimentary prototypes. They lacked key engineering documentation and some existing documentation did not accurately depict the existing prototypes' designs. Likewise, there was insufficient documentation concerning what parts were installed on the aircraft and when, as well as insufficient documentation concerning when or if parts were replaced. While Eve and Unity did undertake test flights without experiencing catastrophic failure, they were not adequate for commercial use. During or after every test flight, the vehicles experienced material mechanical problems—like the near-fatal error of February 2019—and thus were unsafe and unfit for commercial purposes.

9.      Despite these issues occurring at Legacy VG, on July 9, 2019, SCH and Vieco issued a joint press release announcing the Merger that would form Virgin Galactic.

10.      While the Individual Defendants knew, or were highly reckless in not knowing, of the safety problems facing Legacy VG's, and later Virgin Galactic's, vehicles, they nonetheless failed to disclose the existence or extent of the problems and instead caused and/or permitted the Company to issue false and misleading statements about the safety of the Eve and Unity spacecrafts.

11.      This deception allowed the Merger to close on terms that were unreasonable and

4

unfavorable to the Company and its shareholders, given the known yet undisclosed state of affairs at Legacy VG (the "Overpayment Misconduct"). Specifically, Legacy VG's former shareholders would end up with 130 million shares in Virgin Galactic compared to SCH's shareholders receiving about 65 million. The SCH Defendants were motivated to engage in the Overpayment Misconduct given that they would personally benefit from the Merger through the receipt of substantial remuneration in the form of compensation, stock awards, and the ability to unload their shares of Virgin Galactic on the market at artificially inflated prices. The Legacy VG Defendants were motivated to aid and abet this misconduct because they too would personally benefit from the Merger's consummation.

12.     The truth emerged in fits and starts. Beginning in August 2020, Virgin Galactic—without adequate explanation—pushed back scheduled flights. This was the first sign to outside observers that there may have been something wrong with the Company's vehicles. For example, on August 3, 2020, after markets had closed, the Company announced that Defendant Branson would not be flying in a Virgin Galactic spacecraft in 2020 despite having previously maintained that he would do so.

13.     On this news, the Company's stock price fell $3.30 or 13.7% to close August 4, 2020 at $20.72 per share.

14.     When Eve and Unity were able to finally embark on a test flight on Saturday, December 12, 2020, Unity's rocket system failed to activate. That the rockets failed to ignite was reported on contemporaneously by the media, though the cause was not disclosed at that time.[2]

15.     The next trading day, December 14, 2020, the Company's share price fell $5.57 or

---

[2] *See, e.g.*, Michael Sheetz, *Virgin Galactic Cuts Short Spaceflight Attempt after Engine Aborts, Pilots Safely Return to Land*, CNBC (Dec. 12, 2020), https://www.cnbc.com/2020/12/12/virgin-galactic-aborts-spaceflight-attempt-in-new-mexico.html (last visited Feb. 17, 2022).

17.4% to close at $26.47 per share.

16.     Virgin Galactic was able to rehabilitate its image in the near-term when, on February 1, 2021, the Company announced via press release that the issue with the December 2020 test flight had been remediated and that the Company would be conducting a new test flight in February 2021.

17.     On this news, the Company's share price soared to close February 1, 2021 at $53.79.

18.     However, after close of trading that very same day, the *Washington Post*, published a review of a forthcoming book authored by a writer for the *New York Times*, Nicholas Schmidle ("Schmidle"), titled *Test Gods: Virgin Galactic and the Making of a Modern Astronaut*— disclosing that an issue with the February 2019 spaceflight had nearly killed everyone on board. Schmidle was in a position to know having been embedded at Legacy VG from 2014 until July 2018, and having interviewed those who were present for the February 2019 flight after it occurred.

19.     By close of trading on February 2, 2021, the Company's share price had fallen back down to $48.58 per share.

20.     Later on February 2, 2021, a rocket belonging to SpaceX, one of the Company's competitors, exploded on the launchpad. The explosion created the public impression that Virgin Galactic's rockets were further along in development than SpaceX's rockets. In turn, this public impression led to a quick price rebound for the Company's common stock, such that it closed February 3, 2021 at $57.12 per share despite the many problems still afflicting the Company.

21.     On February 25, 2021, Virgin Galactic announced in a press release and on an earnings conference call with investors that in remedying the problem with the December 2020 flight, the Company had inadvertently created other problems with sensors in the Unity vehicle.

As a result, the Company was no longer undertaking a test flight in February 2021. Defendant Colglazier would not commit to a new launch date but indicated that the Company's estimates "suggest [] our next flight will be in May [2021]."

22.     On this news, the Company's common stock declined by $5.01 or 11.8% to close February 26, 2021 at $37.23 per share.

23.     The Company was able to conduct a test flight in May 2021 and in July 2021 it was able to take Defendant Branson into space to much fanfare.

24.     Both the Company and Defendant Branson capitalized on this good news. Between July 12 and July 16, 2021, Virgin Galactic sold $500 million of its shares in the open market. Between August 10 and August 12, 2021, Defendant Branson sold 10.4 million shares for $300.9 million in proceeds; *i.e.*, he sold every Company share he was entitled to sell at the time.

25.     However, during the July 2021 flight, the Unity aircraft strayed outside of its "landing cone" or the volume of space that the Unity is required by Federal Aviation Administration ("FAA") regulations to stay within in order to ensure that the craft makes it back to the intended landing zone and avoids crash landing in an unintended location. Because Unity is designed to expend all its fuel before it begins its descent back towards Earth, it has only a limited ability to course correct once it runs out. Thus, it is crucial that the Unity stay in the pre-planned cone to ensure that its descent occurs in a controlled and safe manner. The Unity has onboard sensors to alert pilots when they are approaching the edge of the cone, and when they have left. Virgin Galactic would later acknowledge that the Unity spent one minute and forty-one seconds—more than 10% of its flight time—outside the cone and thus in violation of FAA regulations.

26.     The FAA told the *Washington Post* that it began investigating these circumstances on July 23, 2021, despite the Company telling investors that the FAA investigation had begun on

August 11, 2021. Under either date, some or all of Defendant Branson's stock sales occurred *after* the FAA was investigating the Company but *before* the Company had announced the existence of either the underlying problem with Unity or the FAA investigation.

27.     What had occurred on the flight would not become public knowledge until September 1, 2021, after the market closed, when the *New Yorker* published an article disclosing that the July 2021 flight had left its cone. In the middle of the next day, September 2, 2021, the FAA announced that it was grounding Virgin Galactic's flights.

28.     On this news, the price per share of the Company's common stock closed September 2, 2021 at $25.99 per share.

29.     Even despite these revelations, the Company still had another test flight planned for 2021. On this flight, the Company was planning to take members of the Italian air force into space.

30.     However, on October 14, 2021, Virgin Galactic issued a press release announcing that—due to a supposedly newly-discovered "possible reduction in the strength margins of certain materials used to modify specific joints"—the Company would be delaying any further test flights until at least the fourth quarter of 2022.

31.     On this news, the price of the Company's common stock fell over 16.9%, or $4.05 per share, from $24.06 at close on October 14, 2021, to $20.01 at close on October 15, 2021.

32.     According to former Company employees cited in the Securities Class Action (defined *infra* at ¶ 40), the defects announced on October 14, 2021 were not newly discovered. They had been known internally since at least 2018.

33.     In breach of their fiduciary duties, the Individual Defendants—aside from Defendants Bates, Osborne, Reses, and Wong—caused and/or permitted Legacy VG (and later the

Company) to operate flights which they knew, or were highly reckless in not knowing, were unsafe. Specifically, Legacy VG's (and later the Company's) vehicles: (1) were not designed for commercial purposes; (2) lacked key engineering and other technical documentation; (3) were mechanically altered without adequate documentation; (4) lacked appropriately scheduled maintenance in order to stick to planned flight schedules; (5) had cracks develop after every test flight; and (6) were subject to an inadequate inspection regime. Scaled Composites, the original designer of the vehicles, only ever intended the vehicle designs to be prototypes, and believed Legacy VG would develop new vehicles based on them, which it never did. Due to extensive documentation problems, Legacy VG, and later the Company, did not know the configuration of either Eve or Unity. Moreover, Unity's flight control system was rudimentary and thus prone to mechanical failure. In light of the foregoing, Unity was not prepared for powered flights, and experienced problems when it undertook them. Despite these facts, the Company still undertook numerous test flights, powered and unpowered, without remedying these problems (collectively, the "Unsafe Flight Misconduct"). One of the flights the Company undertook included the heavily publicized July 2021 flight with Defendant Branson onboard, after which cracks were found in key locations on the vehicles.

34.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Legacy VG (and later the Company) engaged in the Unsafe Flight Misconduct; (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's

horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay; (3) following the destruction of Unity's horizontal stabilizers in February 2019, they were replaced not "upgraded"; (4) the replacement horizontal stabilizers were made of aluminum rather than composite and as such were inferior; and (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

35.     In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to affect their disclosure, rendering them personally liable to the Company.

36.     Moreover, the Legacy VG Defendants aided and abetted the breaches of fiduciary duties engaged in by the SCH Defendants, who caused and permitted SCH to issue false and misleading statements about Legacy VG, the Merger, and the Company. While the Legacy VG Defendants knew the truth of these matters, they failed to correct the false and misleading statements.

37.     Likewise, the SCH Defendants breached their fiduciary duties to the Company by agreeing to the Merger with Legacy VG on terms that were unreasonable to the Company given the known yet undisclosed truth concerning Legacy VG's state of affairs (the "Overpayment Misconduct").

38.     Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in insider sales while the Company's common stock was trading at artificially inflated prices due to the forgoing misrepresentations for collective proceeds of approximately $774

10

million.

39.    In yet further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

40.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former controlling shareholder; its Chairperson; its current Chief Executive Officer ("CEO"), its former CEO; and the President, Space Missions and Safety of a wholly-owned Company subsidiary to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"); the need to undertake internal investigations, the need to implement adequate internal controls; the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

41.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C.

§ 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

43.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action.

44.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

45.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

46.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

47.     Plaintiff is a current shareholder of Virgin Galactic common stock. Plaintiff has continuously held Company common stock at all relevant times.

### Nominal Defendant Virgin Galactic

48.     Virgin Galactic is a Delaware corporation with its principal executive offices at 166 North Roadrunner Parkway, Suite 1C, Las Cruces, New Mexico. Virgin Galactic common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SPCE."

### Defendant Branson

49.     Defendant Branson is one of Legacy VG's founders and the owner of the "Virgin" brand. According to a Form 8-K filed by SCH with the SEC on October 29, 2019, upon the consummation of the Merger, Defendant Branson had control over 114,790,438 shares of Virgin Galactic's common stock, or 58.7%, through subsidiaries of Virgin Group Holdings Limited,

which he owns. This ownership made him a controlling shareholder of the Company during the Relevant Period. Given that the price per share of the Company's common stock at close on October 25, 2019—the day the Merger closed—was $11.79, Defendant Branson beneficially owned $1.35 billion worth of Company common stock

50.     During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Branson made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 12, 2021 | 1,900,000 | $27.77 | $52,772,500 |
| April 13, 2021 | 2,200,000 | $27.21 | $59,862,000 |
| April 14, 2021 | 1,484,000 | $27.16 | $40,311,376 |
| August 10, 2021 | 3,750,000 | $32.87 | $123,251,249 |
| August 11, 2021 | 3,641,000 | $27.91 | $101,638,515 |
| August 12, 2021 | 3,025,000 | $26.46 | $80,038,475 |

Thus, in total, before the fraud was exposed, he sold 16,000,000 shares on inside information for which he received approximately $458 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Palihapitiya**

51.     Defendant Palihapitiya served as the Chairperson of Virgin Galactic's Board from the Merger in October 2019 until February 17, 2022, when he resigned both as Chairperson and as a director. Prior this, Defendant Palihapitiya served as the Chairperson and CEO of SCH since May 2017. Moreover, he and Defendant Osborne share control over the SPAC sponsor, SCH Sponsor Corp. (the "Sponsor"). According to the proxy statement filed by the Company on July 13, 2021 (the "2021 Proxy Statement"), as of June 28, 2021, Defendant Palihapitiya beneficially owned 15,750,000 shares of the Company's common stock, representing 6.5% of the Company's

outstanding shares. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Palihapitiya owned approximately $864 million worth of Virgin Galactic stock.

52.     During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Palihapitiya made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 14, 2020 | 2,000,000 | $27.11 | $54,210,000 |
| December 15, 2020 | 1,800,000 | $24.67 | $44,406,000 |
| March 2, 2021 | 3,100,000 | $35.93 | $111,376,799 |
| March 3, 2021 | 3,100,000 | $33.77 | $104,680,800 |

Thus, in total, before the fraud was exposed, he sold 10,000,000 shares on inside information for which he received approximately $315 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

53.     According to the proxy statement filed by SCH with the SEC on October 10, 2019 in connection with the Merger (the "Merger Proxy Statement"), Defendant Palihapitiya filled one of two directorships in Virgin Galactic over which he personally retained a right to designate the officeholder, with the other directorship being filled by Defendant Bain. Following his and the Sponsor's beneficial ownership in the Company decreasing below 21,375,000 shares, he currently only has the right to designate one such director, which remains Defendant Bain.

54.     The 2021 Proxy Statement stated the following about Defendant Palihapitiya.

Mr. Palihapitiya, 44, has served as the Chairperson of our Board of Directors since May 2017. Mr. Palihapitiya founded our company and served as its Chief Executive Officer since its inception until the Closing in October 2019. Mr. Palihapitiya also served as a director of Slack Technologies Inc. from April 2014 to December 2019. Prior to founding Social Capital in 2011, Mr. Palihapitiya served as Vice President of User Growth at Facebook, and is recognized as having been a major force in its

launch and growth. Mr. Palihapitiya was responsible for overseeing Monetization Products and Facebook Platform, both of which were key factors driving the increase in Facebook's user base worldwide. Prior to working for Facebook, Mr. Palihapitiya was a principal at the Mayfield Fund, one of the United States' oldest venture firms, before which he headed the instant messaging division at AOL. Mr. Palihapitiya graduated from the University of Waterloo, Canada with a degree in electrical engineering.

We believe Mr. Palihapitiya is well qualified to serve as the Chairperson of our Board of Directors because of his extensive management history and experience in identifying, investing in and building next-generation technologies and companies, and because he is a significant stockholder of ours.

**Defendant Moses**

55.     Defendant Moses has served as President of Space Missions and Safety of Galactic Enterprises—a wholly owned subsidiary of Virgin Galactic—since June 2016. Prior to this, from October 2011 until June 2016, he served as Galactic Enterprises' Vice-President of Operations. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Moses beneficially owned 256,605 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Moses owned approximately $14.1 million worth of Virgin Galactic stock.

56.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Moses received $9,342,979 in total compensation from the Company. This included $358,615 in salary, a $95,000 bonus, $5,963,711 in stock awards, $2,837,149 in option awards, $70,000 in non-equity incentive plan compensation, and $18,504 in all other compensation. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Moses received $6,001,072 in total compensation from the Company and Legacy VG. This included $308,899 in salary, $1,039,237 as a bonus, $989,009 in stock awards, $3,563,216 in option awards, $35,145 in non-equity incentive plan compensation, and $65,566 in all other compensation.

57.     The 2021 Proxy Statement stated the following about Defendant Moses:

Mr. Moses has served as the President, Space Missions and Safety of Galactic Enterprises, a wholly owned subsidiary of ours focused on the operation of our spaceflight systems, since June 2016 and is responsible for overseeing program development and spaceflight operations, including vehicle processing, flight planning, astronaut training and flight crew operations. Mr. Moses previously served as Galactic Enterprises' Vice-President of Operations from October 2011 to June 2016. Prior to joining the VG Companies, Mr. Moses served at NASA's Kennedy Space Center in Florida as the Launch Integration Manager from August 2008 to October 2011, where he led all space shuttle processing activities from landing through launch, including serving as the chair of NASA's Mission Management Team, where he provided ultimate shuttle launch decision authority. Mr. Moses served as Flight Director at NASA's Johnson Space Center from April 2005 to August 2008 where he led teams of flight controllers in the planning, training and execution of space shuttle missions. Mr. Moses graduated from Purdue University with a bachelor's degree in Physics and a master's degree in Aeronautical and Astronautical Engineering, and earned a master's degree in Space Sciences from the Florida Institute of Technology. Mr. Moses is a two-time recipient of the NASA Outstanding Leadership Medal.

**Defendant Whitesides**

58.     Defendant Whitesides served as Chief Space Officer and from July 2020 until February 2021, when he left the Company. Prior to this, he served as CEO and a director of Virgin Galactic from the Merger until July 2020. Prior to and until the Merger, Defendant Whitesides served as CEO of Legacy VG since May 2010. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Whitesides beneficially owned 301,994 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Whitesides owned approximately $16.6 million worth of Virgin Galactic stock.

59.     For the 2020 Fiscal Year, Defendant Whitesides received $14,679,129 in total compensation from the Company. This included $454,500 in salary, $9,581,221 in stock awards, $4,613,679 in option awards, and $29,729 in all other compensation. For the 2019 Fiscal Year, Defendant Whitesides received $8,323,753 in total compensation from the Company and Legacy VG. This included $346,346 in salary, $1,536,863 as a bonus, $1,384,605 in stock awards,

$4,988,505 in option awards, $48,383 in non-equity incentive plan compensation, and $19,501 in all other compensation.

60.     The proxy statement filed by the Company with the SEC on April 20, 2020 (the "2020 Proxy Statement") stated the following about Defendant Whitesides:

> ***George Whitesides***. Mr. Whitesides, 46, has served as our Chief Executive Officer and as a member of our Board of Directors since the closing of the Virgin Galactic Business Combination in October 2019, and has served as the Chief Executive Officer of the VG Companies since May 2010. Prior to joining the VG Companies, Mr. Whitesides served as Chief of Staff for NASA from July 2009 to April 2010, and served on the NASA Transition Team from November 2008 to January 2009. Upon departure from the American space agency, he received the Distinguished Service Medal, the highest award the agency confers. Mr. Whitesides has served on various governmental and charitable boards in his career, such as chair of the Reusable Launch Vehicle Work Group for the Federal Aviation Administration's Commercial Space Transportation Advisory Committee, and as a member of the board of Virgin Unite USA, a charitable entity related to Virgin Group Holdings Limited and its affiliates (collectively, the "Virgin Group"). Mr. Whitesides has also served on the executive committee of the Commercial Spaceflight Federation, an industry association (currently as Vice Chair), Caltech's Space Innovation Council, Princeton University's Advisory Council for Mechanical and Aerospace Engineering and the World Economic Forum's Global Future Council on Space Technologies (as Co-Chair and Member). Mr. Whitesides graduated from Princeton University with a degree from the Woodrow Wilson School of Public and International Affairs, earned an MPhil in geographic information systems and remote sensing from the University of Cambridge and was a Fulbright Scholar.

### Defendant Colglazier

61.     Defendant Colglazier has served as CEO of Virgin Galactic and as a director since July 2020. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Colglazier beneficially owned 285,980 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Colglazier owned approximately $15.7 million worth of Virgin Galactic stock.

62.     For the 2020 Fiscal Year, Defendant Colglazier received $21,603,545 in total compensation from the Company. This included $442,308 in salary, a $952,055 bonus,

$13,098,600 in stock awards, $7,540,000 in option awards, and $22,637 in all other compensation.

63.     The 2021 Proxy Statement stated the following about Defendant Colglazier:

Mr. Colglazier, 54, has served as our Chief Executive Officer and as a member of our Board of Directors since July 2020 and has served as our President since February 2021. Mr. Colglazier most recently served as President and Managing Director, Disney Parks International from October 2019 until his departure in July 2020 and, from March 2018 to October 2019, as President and Managing Director, Walt Disney Parks & Resorts, Asia Pacific. In these capacities, he oversaw the operations and development of Disney parks and resorts outside of the United States, focusing on high-growth expansion and development of joint venture opportunities with government agencies. Prior to this, from January 2013 until March 2018, Mr. Colglazier was President of The Disneyland Resort, where he led a workforce of nearly 30,000 employees and drove record business performance and growth. During his 30+ year career at Disney, Mr. Colglazier served in several executive roles where he implemented a series of development and growth strategies across the world focused on product innovation and customer growth. He is currently Chairman of the CEO Roundtable for the University of California, Irvine, and a member of the Engineering Advisory Board of Rice University. He is also a past commissioner and member of the executive committee of the California Travel and Tourism Commission. Mr. Colglazier graduated from Stanford University with a bachelor's degree in Industrial Engineering and holds a master's degree in Business Administration from Harvard Business School.

We believe Mr. Colglazier is well qualified to serve on our Board of Directors because of his extensive experience developing and growing consumer-oriented businesses strategically, commercially and operationally.

**Defendant Austin**

64.     Defendant Austin has served as a Company director since October 2019. She also serves as Chairperson of the Compensation Committee and a member of both the Audit Committee and Safety Committee. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Austin beneficially owned 16,383 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Austin owned approximately $898,000 worth of Virgin Galactic stock.

65.     For the 2020 Fiscal Year, Defendant Austin received $270,280 in total compensation from the Company. This included $145,286 in fees earned or paid in cash and

$124,994 in stock awards. For the 2019 Fiscal Year, Defendant Austin received $331,205 in total compensation from the Company. This included $31,206 in fees earned or paid in cash and $300,000 in stock awards.[3]

66.     The 2021 Proxy Statement stated the following about Defendant Austin:

Wanda Austin. Dr. Austin, 66, has served on the Company's Board of Directors since October 2019. Dr. Austin served as Interim President of the University of Southern California from August 2018 to July 2019, has held an adjunct Research Professor appointment at the University's Viterbi School's Department of Industrial and Systems Engineering since 2007, and became a Life Trustee in 2020. Dr. Austin has been a director of Chevron Corporation and Amgen Inc. since December 2016 and October 2017, respectively. From January 2008 to October 2016, Dr. Austin served as President and Chief Executive Officer of The Aerospace Corporation, an independent nonprofit corporation operating the only federally funded research and development center for the space enterprise and performing technical analyses and assessments for a variety of government, civil and commercial customers. Before becoming President and Chief Executive Officer, Dr. Austin served as Senior Vice President of the corporation's National Systems Group and Engineering and Technology Group. From 2015 to January 2017, Dr. Austin served on the President's Council of Advisors on Science and Technology, advising the President of the United States in areas where an understanding of science, technology and innovation was key to forming effective U.S. policy. Dr. Austin is also a co-founder of MakingSpace, Inc., focused on creating inclusive opportunities for collaboration, and served on the U.S. Human Spaceflight Review Committee from 2009 to 2010, the Defense Science Board from 2010 to 2016, the Space Foundation from 2013 to 2015, the California Council on Science and Technology from 2008 to 2013 and the NASA Advisory Council from 2005 to 2007 and 2014 to 2017. Dr. Austin is a fellow of the American Institute of Aeronautics and Astronautics and a member of the International Academy of Astronautics and the National Academy of Engineering. Dr. Austin is an executive advisor for World50, a community of senior executives from globally respected organizations. Dr. Austin holds a bachelor's degree in mathematics from Franklin & Marshall College, master's degrees in systems engineering and mathematics from the University of Pittsburgh and a doctorate in systems engineering from the University of Southern California.

We believe Dr. Austin is well qualified to serve on our Board of Directors because of her extensive financial and operational experience as well as her deep experience in the aerospace industry.

---

[3] The 2020 Proxy Statement lists Defendant Austin's compensation in this way, despite $31,206 in cash and $300,000 in stock awards adding up to $331,206 total, not $331,205.

### Defendant Bain

67.     Defendant Bain has served as a Virgin Galactic director since the Merger in October 2019 and prior to this was an SCH director since September 2017. He also serves as Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Bain beneficially owned 1,200,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Bain owned approximately $65.8 million worth of Virgin Galactic stock.

68.     For the 2019 Fiscal Year and in connection with his service as an SCH director who helped consummate the Merger, Defendant Bain received $12,516,000 in total compensation from the Company. This consisted entirely of stock awards.

69.     According to the Merger Proxy Statement, Defendant Bain initially filled one of two directorships in Virgin Galactic over which Defendant Palihapitiya retained a right to designate the officeholder. While Defendant Palihapitiya now has the right to nominate only one such director, this position is still filled by Defendant Bain. Thus, Defendant Bain is beholden to Defendant Palihapitiya.

70.     The 2021 Proxy Statement stated the following about Defendant Bain:

Mr. Bain, 47, has served on the Company's Board of Directors since September 2017. Mr. Bain is a co-managing partner of 01 Advisors, a venture capital firm targeting high-growth technology companies, since co-founding the firm in January 2018. Since November 2016, Mr. Bain has also been an independent advisor and investor in select growth-stage companies. Previously, Mr. Bain was the Chief Operating Officer of Twitter from September 2015 until November 2016 and President of Global Revenue & Partnerships from 2010 to September 2015, where he was responsible for the business lines at the public company, building one of the fastest revenue ramps of a consumer internet business. Mr. Bain oversaw employees in multiple countries ranging from Product, Business Operations, Business Development, Media Partnerships, Developer Relations, Twitter's International business and all of the go-to-market Sales teams for the advertising

and data businesses. Previously, Mr. Bain was the President of the Fox Audience Network at Newscorp, responsible for monetizing Fox's digital assets. Mr. Bain started his career running product and engineering teams at Fox Sports and the Los Angeles Times. Mr. Bain earned his Bachelor of Arts in English Journalism from Miami University in Ohio.

Mr. Bain is well qualified to serve on our Board of Directors because of his extensive experience relating to business growth and development within technology and other related industries.

### Defendant Jonas

71.     Defendant Jonas has served as a Company director since June 2021. She also serves

a member of the Audit Committee.

72.     The 2021 Proxy Statement stated the following about Defendant Jonas:

Ms. Jonas, 61, has served as a member of our Board of Directors since June 2021. Ms. Jonas is an independent consultant providing strategic consulting for the defense, aviation and healthcare sectors since 2015. From 2012 to 2014, Ms. Jonas served in several executive roles within UnitedHealthGroup before becoming President, UnitedHealthcare, Military and Veterans. From 2010 to 2012, Ms. Jonas served as Executive Vice President, Operations of PASSUR Aerospace, a business intelligence and aviation firm. From 2008 to 2010, Ms. Jonas served as Director, Operations, Sikorsky Aircraft. From 2004 to 2008, Ms. Jonas served as the Undersecretary Comptroller and Chief Financial Officer for the Department of Defense. From 2002 to 2004, Ms. Jonas served as the Assistant Director and Chief Financial Officer for the Federal Bureau of Investigation. From 2001 to 2002, Ms. Jonas served as Deputy Undersecretary for Financial Management for the Department of Defense. Ms. Jonas has served on the board of directors and the Audit and Finance committee of Centrus Energy Corp. since 2020, and serves on the board of directors of other privately held companies and non-profits. Ms. Jonas holds a Bachelor of Arts degree in political science from Arizona State University and a Master of Arts degree in liberal studies from Georgetown University.

Ms. Jonas is well qualified to serve on our Board of Directors because of her extensive experience financial and operational experience and her experience in the aviation industry.

### Defendant Kreeger

73.     Defendant Kreeger has served as a Company director since the Merger in October

2019. In addition, he serves as Chairperson of the Safety Committee and as a member of the Audit

Committee. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Kreeger

beneficially owned 26,383 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Kreeger owned approximately $1.45 million worth of Virgin Galactic stock.

74.     For the 2020 Fiscal Year, Defendant Kreeger received $267,223 in total compensation from the Company. This included $142,229 in fees earned or paid in cash and $124,994 in stock awards. For the 2019 Fiscal Year, Defendant Kreeger received $331,205 in total compensation from the Company. This included $31,206 in fees earned or paid in cash and $300,000 in stock awards.[4]

75.     During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kreeger made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 17, 2021 | 10,000 | $25.15 | $251,500 |

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

76.     According to the Merger Proxy Statement, Defendant Kreeger fills one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder. Thus, he is beholden to Defendant Branson who controls Vieco US through Virgin Group Holdings Limited.

77.     The Company's 2021 Proxy Statement stated the following about Defendant Kreeger:

---

[4] The 2020 Proxy Statement lists Defendant Kreeger's compensation in this way, despite $31,206 in cash and $300,000 in stock awards adding up to $331,206 total, not $331,205.

Mr. Kreeger, 61, has served on the Company's Board of Directors since October 2019. Mr. Kreeger recently retired from his role as Chief Executive Officer of Virgin Atlantic after leading the company from February 2013 through December 2018. During his tenure at Virgin Atlantic, Mr. Kreeger was responsible for all airline operations and led the company to rebuild its balance sheet, launch its successful joint venture with Delta Airlines and develop a long-term strategy for expanding the joint venture to include Air France and KLM Royal Dutch Airlines. Prior to his tenure at Virgin Atlantic, Mr. Kreeger spent 27 years at American Airlines, where he held a variety of commercial, operational, financial and strategic roles. Mr. Kreeger spent his last six years at American as part of its leadership team overseeing its International Division and then all of its Customer Service. Mr. Kreeger holds a bachelor's degree in Economics from the University of California at San Diego and a Master of Business Administration from the University of California at Los Angeles.

We believe Mr. Kreeger is well qualified to serve on our Board of Directors because of his extensive operational, financial and managerial experience and his deep industry knowledge.

### Defendant Lovell

78.     Defendant Lovell has served as a Company director since the Merger in October 2019. He was appointed Interim Chairperson following Defendant Palihapitiya's resignation on February 17, 2022. In addition, he serves as a member of the Safety Committee.

79.     According to the Merger Proxy Statement, Defendant Lovell fills one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder. Thus, he is beholden to Defendant Branson who controls Vieco US through Virgin Group Holdings Limited.

80.     The Company's 2021 Proxy Statement stated the following about Defendant Lovell:

Mr. Lovell, 51, has served on the Company's Board of Directors since October 2019. Mr. Lovell has been a Partner of Virgin Group Holdings Limited and its affiliates (collectively, the "Virgin Group") since October 2012 and is responsible for managing the Virgin Group's investment team globally. Mr. Lovell currently serves as a member of the board of directors for a number of Virgin Group portfolio companies, including BMR Energy Ltd., V Cruises US, LLC, Virgin Cruises Intermediate Limited, Virgin Cruises Limited, Vieco 10 Limited, Virgin Hotels, LLC, Virgin Sport Group Limited, Virgin Sport Management USA, Inc. and VO

Holdings, Inc. From December 2008 to June 2019, Mr. Lovell was a member of the board of directors of AquaVenture Holdings Limited, and from April 2013 to December 2016 was a member of the board of directors of Virgin America Inc. From September 1997 to October 2007, Mr. Lovell served as an investment professional at TPG Capital, where he also served on the board of a number of TPG portfolio companies. Mr. Lovell holds a bachelor's degree in Political Science from the University of Vermont.

We believe Mr. Lovell is well qualified to serve on our Board of Directors because of his extensive experience as a seasoned investor and operator.

**Defendant Mattson**

81.     Defendant Mattson has served as a Company director since the Merger in October 2019. In addition, he serves as Chairperson of the Audit Committee and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of June 28, 2021, Defendant Mattson beneficially owned 16,383 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 28, 2021 was $54.84, Defendant Mattson owned approximately $898,000 worth of Virgin Galactic stock.

82.     For the 2020 Fiscal Year, Defendant Mattson received $246,147 in total compensation from the Company. This included $121,153 in fees earned or paid in cash and $124,994 in stock awards. For the 2019 Fiscal Year, Defendant Mattson received $327,534 in total compensation from the Company. This included $27,534 in fees earned or paid in cash and $300,000 in stock awards.

83.     According to the Merger Proxy Statement, Defendant Mattson fills one of three directorships in Virgin Galactic for which Vieco US retains the right to designate the officeholder. Thus, he is beholden to Defendant Branson who controls Vieco US through Virgin Group Holdings Limited.

84.     The Company's 2021 Proxy Statement stated the following about Defendant

Mattson:

> Mr. Mattson, 55, has served on the Company's Board of Directors since October 2019. Mr. Mattson has served as a director for Delta Air Lines, Inc. ("Delta") since October 2012, and as co-chairman and director of NextGen Acquisition Corp. and NextGen Acquisition Corp. II, special purpose acquisition companies, since October 2020 and January 2021, respectively. Mr. Mattson previously served as a Partner and Co-Head of the Global Industrials Group in Investment Banking at Goldman, Sachs & Co. from November 2002 through August 2012. Mr. Mattson joined Goldman Sachs in 1994, and served in a variety of positions before becoming Partner and Co-Head of the Global Industrials Group. Mr. Mattson holds a bachelor's degree in Electrical Engineering from Duke University and a Master of Business Administration from the Wharton School of the University of Pennsylvania.

> We believe Mr. Mattson is well qualified to serve on our Board of Directors because of his extensive professional and financial experience and his experience as a public company director.

### Defendant Ryans

85.     Defendant Ryans served as a Virgin Galactic director from the Merger in October 2019 until February 2021 when he stepped down. He was also an SCH director from February 2018 until the Merger. During part of the Relevant Period, he served as Chairperson of the Audit Committee and as a member of the Nominating and Governance Committee.

86.     For the 2020 Fiscal Year, Defendant Ryans received $278,155 in total compensation from the Company. This included $153,161 in fees earned or paid in cash and $124,994 in stock awards. For the 2019 Fiscal Year and in connection with his service as an SCH director who helped consummate the Merger, Defendant Ryans received $1,377,877 in total compensation from the Company. This included $34,877 in fees earned or paid in cash and $1,343,000 stock awards.

87.     During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ryans made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 16, 2020 | 30,000 | $26.43 | $792,900 |

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

88.     The 2020 Proxy Statement stated the following about Defendant Ryans:

*James Ryans.* Dr. Ryans, 44, has served as a member of our Board of Directors since February 2018. Dr. Ryans has been a professor of accounting at London Business School since 2016. Dr. Ryans teaches financial accounting at the graduate and post-graduate levels, and directs an executive education program on mergers and acquisitions. His current research focuses on topics in mergers and acquisitions, firm disclosure and government oversight of financial reporting. From 2012 until 2016, Dr. Ryans was a graduate student instructor at the University of California Berkeley. From 2003 to 2011, Dr. Ryans oversaw investments and business development at Chelsea Rhone LLC and its affiliate HealthCap RRG, a mutual insurance company. From 1999 until 2001, Dr. Ryans was a consultant with Deloitte & Touche. Dr. Ryans is a CFA charterholder and holds a Ph.D. in business administration from the University of California Berkeley, an MBA from the University of Michigan and a BASc in electrical engineering from the University of Waterloo.

We believe Dr. Ryans is well qualified to serve on our Board of Directors because of his extensive background and expertise relating to financial consulting, financial accounting and other related industries.

**Defendant West**

89.     Defendant West has served as a Virgin Galactic director since February 2021. He also serves as a member of the Safety Committee.

90.     The 2021 Proxy Statement stated the following about Defendant West:

Mr. West, 60, has served Chief Operating Officer of Cruise LLC, GM's majority-owned autonomous vehicle subsidiary, since January 2021, helping in the company's progression towards commercialization. Prior to this, Mr. West served in various leadership positions since he began his career with Delta in March 2008 and, most recently, from February 2014 to October 2020, served as its Senior Executive Vice President and Chief Operating Officer, overseeing Delta's worldwide operations, including 366 airports in 66 countries, 1,300 aircraft, 200 million customers per year, more than 70,000 employees and an annual budget of

$16 billion. Prior to joining Delta, Mr. West served as President and Chief Executive Officer of Laidlaw Transit Services, a provider of transportation serves, from 2006 to 2007. Mr. West currently serves on the board of directors of Forward Air Corporation (Nasdaq: FWRD) and Genesis Park Acquisition Corp. (NYSE: GNPK). Mr. West has also been a member of the Brevard College Board of Trustees in North Carolina since October 2017 and previously served on the Board of Directors for the American Cancer Society and member of its Executive Leadership Council. Mr. West holds a Bachelor of Science in Mechanical Engineering from North Carolina State University and a Master of Business Administration from National University.

We believe Mr. West is well qualified to serve on our Board of Directors because of his extensive professional experience in the transportation industry and serving as senior executive of a large public company overseeing its extensive operations.

**Defendant Bates**

91.     Defendant Bates served as Vice Chairman of SCH's Board from May 2017 until the Merger.

92.     The Merger Proxy Statement stated the following about Defendant Bates:

Anthony Bates has been the Vice Chairman of SCH's board of directors since May 2017. Mr. Bates has served as Genesys Telecommunications Laboratories, Inc.'s Chief Executive Officer, a provider of omnichannel customer experience and contact center solutions, since May 2019. Mr. Bates was previously a partner and the Chief Executive Officer of Growth at Social Capital from May 2017 to July 2018. From June 2014 until December 2016, Mr. Bates served as President of GoPro, Inc., a maker of video and photo capture devices. From June 2013 until March 2014, Mr. Bates was the Executive Vice President, Business Development and Evangelism of Microsoft Corporation, a software company. Mr. Bates was the Chief Executive Officer of Skype Inc., a provider of software applications and related Internet communications products, from October 2010 until its acquisition by Microsoft in 2011, subsequent to which Mr. Bates served as the President of Microsoft's Skype Division until June 2013. From 1996 to October 2010, Mr. Bates served in various roles at Cisco Systems, Inc., a networking equipment provider, most recently as Senior Vice President and General Manager of Enterprise, Commercial and Small Business. Mr. Bates currently serves on the board of directors of GoPro, Inc., VMware, Inc. and Ebay, Inc.

**Defendant Osborne**

93.     Defendant Osborne served as President of SCH and a member of its Board from May 2017 until the Merger.

94.     At the time of filing of the Merger Proxy Statement, Defendant Osborne shared control of the Sponsor with Defendant Palihapitiya. According to the 2021 Proxy Statement, 15,750,000 shares of Company common stock that Defendant Palihapitiya beneficially owned were directly owned by the Sponsor. Thus, given that the price per share of the Company's common stock at the close of trading on June 28, 2021, was $54.84, Defendant Osborne beneficially owned approximately $864 million worth of Virgin Galactic stock.

95.     The Merger Proxy Statement stated the following about Defendant Osborne:

Mr. Ian Osborne has been SCH's President and a director since May 2017. Mr. Osborne is the Co-founder and Chief Executive Officer of Hedosophia, a venture growth firm, which has invested in leading Internet and technology companies since 2012. Mr. Osborne has advised leading Internet and technology companies, their founders and CEOs, since 2009. Mr. Osborne is also the founder and Chairman of Osborne & Partners, a strategic advisory firm, and founder, indirect controlling shareholder and a director of Connaught, a financial advisory firm. Mr. Osborne also served as a Partner and Managing Director at DST Global, a family of funds investing in internet companies, which was established in 2009 and with high profile successes including Alibaba, Airbnb, Facebook, Spotify and Twitter. Mr. Osborne was educated at St Paul's School, King's College London, and the London School of Economics.

**Defendant Reses**

96.     Defendant Reses served as an SCH director from February 2018 until the Merger.

97.     For the 2019 Fiscal Year and in connection with her service as an SCH director who helped effectuate the consummation of the Merger, Defendant Reses received $1,043,000 in total compensation from the Company. This consisted entirely of stock awards.

98.     The Merger Proxy Statement stated the following about Defendant Reses:

Jacqueline D. Reses has been a director since February 2018. Ms. Reses has served as Square Capital Lead since October 2015 and previously served as People Lead of Square, Inc. from February 2016 to July 2018. From September 2012 to October 2015, Ms. Reses, served as Chief Development Officer of Yahoo! Inc. In this role, she focused on developing partnerships, acquisitions and investments, significant corporate and tax transactions, as well as recruiting, operations and people leadership. Prior to joining Yahoo, Ms. Reses led the U.S. media group as a Partner

at Apax Partners Worldwide LLP, a global private equity firm, which she joined in 2001. Ms. Reses previously served on the board of directors of Alibaba Group Holding Limited and is currently on the board of National Public Radio and the Economic Advisory Council of the Federal Reserve Bank of San Francisco. Ms. Reses holds a BS in Economics with honors from the Wharton School of the University of Pennsylvania.

**Defendant Wong**

99.     Defendant Wong served as an SCH director from September 2017 until the Merger.

100.     For the 2019 Fiscal Year and in connection with her service as an SCH director who helped effectuate the consummation of the Merger, Defendant Wong received $1,043,000 in total compensation from the Company. This consisted entirely of stock awards.

101.     The Merger Proxy Statement stated the following about Defendant Wong:

Andrea Wong has been a director since September 2017. Ms. Wong has served as President, International Production for Sony Pictures Television Inc. and President, International for Sony Pictures Entertainment Inc. since September 2011. She previously served as President and Chief Executive Officer of Lifetime Entertainment Services, LLC from 2007 to April 2010. Ms. Wong also served as Executive Vice President with ABC, Inc., a subsidiary of The Walt Disney Company, from 2003 to 2007. Ms. Wong has served as a director of Liberty Media Corporation since April 2010, as a director of Liberty Interactive Corporation since April 2010, as a director of Hudson's Bay Company since September 2014 and as a director of Hudson Pacific Properties, Inc. since August 2017. Ms. Wong holds a BS in electrical engineering from the Massachusetts Institute of Technology and an MBA from the Stanford University Graduate School of Business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

102.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

103.    Each controlling shareholder, director, and officer of the Company owed the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

104.    The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

105.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

106.    Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

107.    As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

108.    To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Mexico, and the United States, and pursuant to Virgin Galactic's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

109.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

110. At all times relevant hereto, the Individual Defendants were the agents of each other and/or of the Company and were at all times acting within the course and scope of such agency.

111. Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

112. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

113. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

114. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

115. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

116.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

## VIRGIN GALACTIC'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Code of Conduct

117.    Virgin Galactic's Code of Conduct opens by stating that the "Code of Business Conduct and Ethics [] contains general guidelines for conducting the business of Virgin Galactic Holdings, Inc. [] consistent with the highest standards of business ethics."

118.    The Code of Conduct further provides that it "applies to all of our directors, officers and other employees."

119.    Regarding "Reporting Violations of the Code," the Code of Conduct states: "All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct[.]"

120.     Regarding "Waivers of the Code," the Code of Conduct provides that "[a]ny waiver of this Code for our directors, executive officers or other principal financial officers may be made only by our Board of Directors and will be disclosed to the public as required by law or the rules of the New York Stock Exchange, when applicable."

121.     The Code of Conduct contains a detailed section on how to deal with "Conflicts of Interest." This section provides that:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

> Identifying potential conflicts of interest may not always be clear-cut. The following situations might reasonably be expected to give rise to a conflict of interest and should be identified to, and addressed by, an Authorized Officer or the Board of Directors:

> • Outside Employment. An employee being employed by, serving as a director of, or providing any services to a company that the individual knows or suspects is a material customer, supplier or competitor of the Company (other than services to be provided as part of an employee's job responsibilities for the Company).

> • Improper Personal Benefits. An employee or director obtaining any material (as to the individual) personal benefits or favors because of the individual's position with the Company. Please see "Gifts and Entertainment" below for additional guidelines in this area.

> • Financial Interests. An employee having a "material interest" (ownership or otherwise) in any company that the individual knows or suspects is a material customer, supplier or competitor of the Company and using the employee's position to influence a transaction with such company. Whether an employee has a "material interest" will be determined by an Authorized Officer or the Board of Directors, as applicable, in light of all of the circumstances, including consideration of the relationship of the employee to the customer, supplier or competitor, the relationship of the employee to the specific transaction and the importance of the interest to the employee having the interest.

122.     The Code of Conduct makes clear the importance of maintaining accurate Company records stating: "All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control." Separately, the Code of Conduct provides that: "The Company's principal financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts."

123.     The Code of Conduct also contains provisions related to the "Protection and Use of Company Assets[.]" The Code of Conduct states: "Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited."

124.     At a high level, the Code of Conduct states: "Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations." Regarding insider trading laws specifically, the Code of Conduct provides that "the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company." When it comes to health and safety laws, the Code of Conduct provides that: "The Company is committed not only to complying with all relevant health and safety laws, but also to conducting business in a manner

36

that protects the safety of its employees. All employees are required to comply with all applicable health and safety laws, regulations and policies relevant to their positions."

### *Audit Committee Charter*

125.    The Company also maintains an Audit Committee Charter. Regarding the Company's annual Forms 10-K, the Audit Committee Charter states that: "The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

126.    Likewise, with respect to the Company's quarterly Forms 10-Q, the Audit Committee Charter states that: "The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

127.    Moreover, with respect to the Company's earnings press releases, the Audit Committee Charter provides that: "The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."

128.    On the topic of "Risk Assessment and Risk Management," the Audit Committee Charter states that: "The Committee must: oversee enterprise risk management including the management of financial risks and cybersecurity risks; review and discuss the Company's guidelines and policies with respect to risk assessment and risk management; and discuss with management the steps management has taken to monitor and control these exposures."

129.    Finally, with respect to the Company's "Internal Control Over Financial Reporting," the Audit Committee Charter provides that: "The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct."

### Safety Committee Charter

130.    The Company's Safety Committee Charter provides among the Safety Committee's responsibilities:

1. Reviewing the status of the Company's safety performance, including processes to ensure compliance with internal policies and goals and applicable laws and regulations.

2. Reviewing and providing input to the Company on the management of current and emerging safety issues.

3. Assisting the Board with oversight of the Company's risk management processes.

4. Assisting the Board with oversight of the Company's security processes.

5. Reviewing the annual strategy and resources of the Company's safety organization.

6. Reviewing management's synopsis of the Company's safety policies, systems and, where available, benchmarks against industry standards and best practices.

7. Reviewing, at least annually, processes designed to mitigate key safety risks.

8. Reviewing methods used to communicate the Company's core safety values to employees, including the use of notices concerning safety throughout the Company's facilities and training courses.

9. Reviewing management's update to the Committee, which shall be provided annually, regarding the materials used in communicating the Company's core values concerning the proactive promotion of safety to employees and contractors that are retained through procurement and supply channels.

10. Reviewing management's report to the Committee, which shall be provided at least annually and with the assistance of such independent experts as the Committee may deem appropriate, on key changes to significant safety industry standards in key countries in which the Company operates, as well as any areas of material noncompliance with any such standards.

11. Reviewing periodic updates on significant safety policy issues in key countries of operation that may materially impact the Company's operations, finances or reputation, along with management's response to such matters.

12. Reviewing safety audit results and findings, action plans instituted pursuant to safety audits and findings made as a result of any investigations into significant occurrences.

13. Making periodic visits to the Company's facilities and discussing safety issues related to those facilities.

*          *          *

131. In violation of the Code of Conduct and the Company's corporate governance, the Individual Defendants who worked at Virgin Galactic conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Unsafe Flight Misconduct, to issue materially false and misleading statements to the public, to facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and aiding and abetting thereof. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. In further violation of the Code of Conduct and relevant corporate the Individual Defendants who worked at Virgin Galactic failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Moreover, the Individual Defendants who worked at Virgin

Galactic failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which constitutes a further violation of the Code of Conduct.

132. In violation of the Audit Committee Charter, Defendants Austin, Jonas, Kreeger, Mattson, and Ryans failed to adequately review and discuss the Company's Forms 10-K, Forms 10-Q, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

133. In violation of the Safety Committee Charter, Defendants Austin, Kreeger, Lovell, and West failed to adequately review the status of the Company's safety performance; review and provide input regarding safety issues; assist the Board with oversight of risk management and security processes; review the annual strategy and resources of the Company's safety organization; review the Company's safety policies, systems, and benchmarks against industry standards; review processes designed to mitigate key safety risks; review methods used to communicate the Company's core safety values; review periodic updates on significant safety policy issues in key countries of operation that may materially impact the Company's operations and review management's annual update on the same; review safety audit results, findings, and action plans; and make periodic visits to the Company's facilities and discussing safety issues related to those facilities.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Merger and the Overpayment Misconduct

134. On or about September 18, 2017, SCH's IPO closed. As a SPAC, SCH had no operations of its own, but instead sought to combine with an operating company and take on that company's operations as its own. The operating company benefits from the business combination

by getting access to investment without undergoing the strictures of a formal IPO, and the SPAC and its shareholders benefit by having (ideally) more valuable shares from combining with a valuable target company.

135.    As a SPAC, SCH had a two-year window from September 2017 to find and merge with an appropriate target company. If a merger were not consummated during this permitted time, money would be returned to shareholders and the SPAC would liquidate. If this were to happen, the Sponsor and its affiliates—including the SCH Defendants—would not reap the windfall they would if they successfully guided SCH through a merger.

136.    On July 9, 2019, when SCH had a little more than two months left to consummate a deal and about a month after Legacy VG's Safety Director, Todd Ericson ("Ericson"), resigned, Legacy VG and SCH announced in a press release that they were going to be merging, with the Company emerging from the Merger as Virgin Galactic.

137.    Per the terms of the Merger, *inter alia*, Legacy VG's existing owners would receive 130 million shares of Virgin Galactic valued at $10 each, and SCH's existing shareholders would hold about 65 million shares of shares of post-Merger Virgin Galactic. In addition, 15.75 million new shares would be issued to the Sponsor in consideration for its help in effecting the Merger.

138.    These terms were unfavorable and unreasonable to SCH's shareholders, given that Legacy VG was engaged in the undisclosed Unsafe Flight Misconduct. This misconduct made Legacy VG a less valuable acquisition than SCH's shareholders were led to believe.

139.    However, the SCH Defendants were motivated to accomplish the Merger notwithstanding that it was on terms unfavorable to Company shareholders because they personally stood to benefit. As mentioned, the Sponsor, controlled by Defendants Palihapitiya and Osborne, received 15,750,000 shares of Virgin Galactic common stock under the terms of the

Merger. According to the 2021 Proxy Statement, the Sponsor still owned 15,750,000 shares of Virgin Galactic common stock as of June 28, 2021, which at that time was worth $54.84 per share. Thus, Defendant Palihapitiya and Osborne had beneficial ownership of $864 million worth of Virgin Galactic stock stemming from the Merger. Likewise, Defendant Bain received 1,200,000 shares Virgin Galactic in stock awards—the grant date fair value of which was $12,516,000—and Defendants Reses, Ryans, and Wong received 100,000 shares each of Virgin Galactic in stock awards—the grant date fair value of which was $1,043,000.

140.   Defendant Branson was also incentivized to consummate the Merger because its terms favored him personally. As part of the Merger, Defendant Branson retained the right to require Defendant Palihapitiya to purchase 10 million shares indirectly owned by Vieco as well as to require Virgin Galactic to purchase up to $200 million of Virgin Galactic shares owned by Vieco, subject to certain conditions. Vieco was otherwise subject to a "lock-up" agreement requiring it to hold at least 50% of its Virgin Galactic stock until October 2021. Defendant Branson exercised his rights against Defendant Palihapitiya and Virgin Galactic, extracting the maximum value he could out of the Merger for himself personally.

### The Unsafe Flight Misconduct

#### *Background*

141.   Legacy VG was less valuable than it appeared because its flights were not as safe as publicly represented, a problem which existed for years prior to the Relevant Period. Once Virgin Galactic inherited Legacy VG's vehicles and operations following the Merger, the Unsafe Flight Misconduct continued at the Company.

142.   Legacy VG's, and later the Company's, two spacefaring vehicles are Eve and Unity. They work in tandem to deliver a small crew into the lower reaches of outer space.

Specifically, Eve carries Unity to 45,000 feet above the Earth, at which point Unity detaches from Eve. Following this detachment, Eve returns to Earth while Unity ignites its onboard rockets and flies on an almost vertical trajectory into space. This process expends all of Unity's fuel. Unity then spends a short time in space before gliding back down to Earth, where it lands in a pre-planned landing zone. To ensure that this landing zone is reached despite Unity not having any fuel, it is crucial that Unity's descent occur within a pre-planned "landing cone." To stray too far from the landing cone would make reaching the landing zone impossible, which would necessitate a crash landing in an unplanned location.

143.    Testing of this flight process involved many dry runs in which Eve would carry Unity into position at which point Unity would detach without deploying its rockets to test its airworthiness and ability to control its glide back to the landing zone. This constituted a "non-powered" test. Conversely, in a "powered" test, Unity's rockets were ignited and its ability to enter and withstand space was tested.

### Legacy VG's History of Touting "Success" Despite Major Safety Concerns on Flights

144.    Legacy VG was founded in 2004 as a joint venture between Virgin and an aerospace manufacturing company called Scaled Composites. In October 2004, Scaled Composites won a ten-million-dollar prize for successfully launching a reusable crewed vehicle into space twice in two weeks.

145.    Scaled Composites had been in the business of making experimental and prototype aircrafts since 1982, when it was founded by Burt Rutan. For example, Scaled Composites built the "Voyager" aircraft that successfully flew around the world without stopping or refueling in 1986. While Scaled Composites has a history of building unique experimental designs and prototypes, it is not in the business of creating widely used commercial vehicles.

146.    Moreover, Scaled Composites' history with experimental designs was not without blemishes. In July 2007, Scaled Composites was testing a tank containing rocket fuel when the tank exploded, killing three people. However, Scaled Composites escaped an OSHA investigation without being charged.

147.    However, in October 2014, when Legacy VG was testing out one of Scaled Composites' shuttle designs, human error by the shuttle's copilot caused the aircraft to disintegrate mid-flight. While the pilot survived the accident, the copilot was killed.

148.    Following this episode, Legacy VG ceased its partnership with Scaled Composites and instead utilized Legacy VG's sister company, The Spaceship Company, to manufacture its vehicles.

149.    However, this swap in manufacturers was not a complete pivot in terms of design. The Spaceship Company inherited the Unity design from Scaled Composites, which was approximately 65% complete as of November 2014.

150.    Over the course of the next few years, Legacy VG was able to further develop its shuttle and began embarking on test flights. However, Unity and Eve still suffered from numerous safety issues.

151.    For example, as Schmidle would later relate in his book, on January 11, 2018 during a test flight, the Unity shuttle's left horizontal stabilizer malfunctioned, activating a flashing red light in the cockpit. The test pilot, Mark Stucky ("Stucky"), knew that if this went uncorrected that the aircraft would flip upside down. He made an emergency decision to attempt to use Unity's backup power to move the left horizontal stabilizer. This was successful; had it not been, the Unity would almost certainly have crashed.

152.    Despite this "near miss," Legacy VG issued a post-flight press release stating:

44

January blues? Not a problem in Mojave today as VSS Unity *successfully completed* her seventh glide flight!

It's been a few months since our last flight, during which we worked through a planned period of focused ground time. This involved extensive analysis, testing and small modifications to ensure vehicle readiness for the higher loads and forces of powered test flight. Today we tested that work by pushing Unity's atmospheric capabilities hard, touching top-end glide speeds as pilots Mark 'Forger' Stucky and Michael 'Sooch' Masucci completed a busy test card."

*          *          *

Alongside confirming the work that has taken place on the ground, the glide flight tested transonic flight performance, stability and control. After release from mothership VMS Eve, the spaceship was immediately pushed into a sharp descent, accelerating to Mach 0.9 which is around the maximum airspeed we can achieve without igniting the rocket motor!

At this stage of the glide flight program, each flight is essentially a dry run for rocket-powered test flights. Where possible the team replicates those powered flight conditions by, for example, adding water ballast to simulate the weight and positioning of the rocket motor.

Congratulations to Forger and Sooch, as well as VMS Eve crew, CJ Sturckow, Kelly Latimer and Richard Starke, *for a well-executed flight*, supported of course by the Virgin Galactic and The Spaceship Company teams on the ground.

(Emphasis added.)

153.    On April 5, 2018, Unity undertook its first powered test flight. That is, for the first time the vehicle's rocket would ignite midflight after the Eve was in position. Prior to this, once the Unity got into position, it would merely test its abilities in a glide back down to Earth. At about 60,000 feet, with Unity travelling 1.8 times the speed of sound, Stucky felt the Unity violently shaking and said: "Abort, abort, abort!" Given its speed, the Unity climbed higher to nearly 85,000 feet. Then, its gyroscope failed. Stucky noted that though the Unity was upside down, the gyroscope showed it was right-side up.

154.    Still, the flight landed safely. Legacy VG issued a press release framing this test as a resounding success:

We are delighted to report on a major step forward for Virgin Galactic today, as SpaceShipTwo VSS Unity safely and successfully completed her first supersonic, rocket-powered flight. ***After two years of extensive ground and atmospheric testing, the passing of this milestone marks the start of the final portion of Unity's flight test program.*** The flight was also significant for Virgin Galactic's Mojave based, sister manufacturing organization, The Spaceship Company. Unity is the first vehicle to be built from scratch for Virgin Galactic by The Spaceship Company's talented team of aerospace engineers and technicians. ***They were justifiably proud today to be a part of this compelling demonstration of their capabilities in action.***

VSS Unity benefits from all the data and lessons gathered from the test program of her predecessor vehicle, VSS Enterprise. ***Today's flight saw an envelope expansion for the program as a whole in terms of rocket burn duration, speed and altitude achieved.***

VSS Unity took off this morning into clear Mojave skies at 8:02am with Mark "Forger" Stucky and Dave Mackay in the cockpit, attached to the WhiteKnightTwo carrier aircraft, VMS Eve, piloted today by Mike Masucci and Nicola Pecile.

The mated vehicles climbed to a launch altitude of around 46,500ft over the Sierra Nevada Mountains and while pointing back at Mojave, Eve executed a clean release of Unity. ***After a few seconds, Unity's rocket motor was brought to life and the pilots aimed the spaceship upwards into an 80 degree climb, accelerating to Mach 1.87 during the 30 seconds of rocket burn.*** The hybrid (nitrous oxide / HTPB compound) rocket motor, which was designed, built and tested by The Spaceship Company, powered Unity today through the transonic range and into supersonic flight for the first time.

On rocket shutdown, Unity continued an upwards coast to an apogee of 84,271ft before readying for the downhill return. At this stage, the pilots raised the vehicle's tail booms to a 60 degree angle to the fuselage, into the 'feathered' configuration. This unique design feature, ***which is key to a reliable and repeatable re-entry capability for a winged vehicle***, incorporates the additional safety mechanisms adopted after the 2014 VSS Enterprise test flight accident.

At around 50,000ft, the tail-booms were lowered again and, while jettisoning the remaining oxidizer, Unity turned towards Mojave for the glide home and a smooth runway landing.

The flight has generated valuable data on flight, motor and vehicle performance which our engineers will be reviewing. It also marks a key moment for the test flight program, entering now the exciting phase of powered flight and the expansion to full duration rocket burns. While we celebrate that achievement, the team remains focused on the challenging tasks which still lie ahead.

(Emphasis added.)

155.    Following this test, Legacy VG was notified from the manufacturer of the Unity's reaction control system ("RCS") that some RCS components were defective. The RCS consists of pressurized nozzles that assist the Unity in positioning itself in no- and low-atmosphere environments—like outer space—where more typical aerodynamic controls would be ineffective. Due to the defects noted by the manufacturer, the RCS was at risk of being stuck in an "open" position. This, in turn, posed the risk of causing the Unity to spin out and lack the pressurized gas to right itself.

156.    On July 26, 2018, the Unity was again on a test flight. As Schmidle would later write in his book, the test pilot that day, David Mackay ("Mackay"), had previously had issues with the RCS. Due to poor cockpit design, he had fired it in rapid bursts unintentionally when trying to only move the yoke—the device used to pilot the vehicle. Despite Legacy VG's knowledge of this problem prior to the day's flight, it was not corrected. Thus, during the flight, the Unity began to "roll" at ten times the recommended rate due to unintentional RCS use. Mackay expended all the RCS gas and then nearly all of the backup RCS gas to get the Unity back under control.

157.    Following this flight, Legacy VG issued yet another rosy press release stating:

Virgin Galactic test pilots broke Mach 2 this morning, as VSS Unity took her third rocket-powered supersonic outing in less than four months. After a clean release from carrier aircraft VMS Eve at 46,500 ft, pilots Dave Mackay and Mike "Sooch" Masucci lit the spaceship's rocket motor, before pulling up into a near vertical climb and powering towards the black sky at 2.47 times the speed of sound.

*          *          *

***After a safe landing back at Mojave Air and Space Port***, Chief Pilot Dave Mackay summed up the experience: "It was a thrill from start to finish. Unity's rocket motor performed magnificently again and Sooch pulled off a smooth landing. This was a

new altitude record for both of us in the cockpit, not to mention our mannequin in the back, and the views of Earth from the black sky were magnificent."

                    *                    *                    *

Every time VSS Unity is tested on the ground, or in the skies, we gain invaluable experience and fresh data. This continuously improves our modelling and helps us optimize objectives and test points as we progressively expand the flight envelope. Today's test, among other things, gathered more data on supersonic aerodynamics as well as thermal dynamics.

                    *                    *                    *

Congratulations to everyone at Virgin Galactic and The Spaceship Company today for achieving another significant step towards commercial service. With VSS Unity, VMS Eve and the pilots safely back on the ground, we will now analyze the post-flight data as we plan and prepare for our next flight.

(Emphasis added.)

### The February 22, 2019 Test Flight

158.    Despite having unresolved issues with its vehicles, Legacy VG still managed to successfully get Unity into space for the first time during a December 2018 test flight.

159.    However, this flight was not without problems. Thirty seconds into the Unity's rockets' ignition, Unity started to veer of course. Stucky tried to correct but his initial attempt caused Unity to roll all the way over and continue rolling. Eventually, Stucky got Unity back under control but, as Schmidle would write: "They were in unknown, unchartered aerodynamic territory[.]"

160.    Buoyed by having reached space in December 2018, Legacy VG planned to take a passenger to space in February 2019, as the next phase of its development.

161.    This occurred on February 22, 2019, when a pilot, a copilot, and Legacy VG's chief customer trainer—acting as a passenger—took off. While Legacy VG contemporaneously reported

it as a success, two years later the press would report that the flight nearly ended in disaster when the Unity's horizontal stabilizer broke and nearly killed everyone aboard.

162.    Doug Messier ("Messier"), an independent commercial aerospace journalist who published an article about the Company on his own website—www.parabolicarc.com—on February 2, 2021, stated that the coverup began immediately, with the pilots landing Unity away from the press waiting on the runway to capture Unity's landing. Messier's article also noted that "Virgin Galactic declined to comment on why the damaged elevons were not disclosed to investors before Virgin Galactic merged with Social Capital Hedosophia and went public on the New York Stock Exchange[.]"

163.    Likewise, Schmidle would later write in his book—and the *Washington Post* would report in their February 2021 review—that when Unity was taken into the hangar that Stucky, who was waiting on the ground, told him that "[i]t looked like someone ripped the caulking out of a bathtub" with another employee, Ericson,remarking that "The structural integrity of the entire stabilizer was compromised." Moreover, Ericson said to Schmidle: "***I don't know how we didn't lose the vehicle and kill three people.***" (Emphasis added.)

164.    A former employee of The Spaceship Company and Scaled Composites who worked on Eve and Unity was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "FE 6." FE 6 stated that Legacy VG was "super lucky" in that the horizontal stabilizer "popped like a bag of chips" in the right location. Had it "popped like a bag of chips" in a different location, everyone would have died.

165.    According to Schmidle, Legacy VG had, at some point after December 12, 2018, removed the thermal shielding on the horizontal stabilizers and replaced it with a thin film called Kapton, which acts as a heat shield. While doing this, engineers accidentally covered the air vents

on the horizontal stabilizer. The air vents allow the air inside the stabilizers to escape as the Unity enters space. However, with the holes covered, the air had nowhere to go and escaped not through the covered vents but instead by breaking through a structural weak point in the horizontal stabilizer.

166.    Moreover, not all the panels on the horizontal stabilizer had been installed when the February 2019 test flight took place. After the flight, a bag of screws was found taped inside one of the horizontal stabilizers. This bag was for use in installing the not-yet-installed panels.

167.    FE 6 stated that when technicians prepping the Unity pre-flight could not find the screws needed to fasten the panels, they used a workaround instead. FE 6 described how every pre-flight certification involved two inspectors, who were usually the Crew Chief and an airframe and powerplant mechanic. Each conducted their own inspection and signed a document stating that they had done so. FE 6 said that prior to the February 2019 flight, these certifications must have been "rubber-stamped" since the screw problem was so "obvious" that it could not have been missed by two competent inspectors.

168.    However, none of these issues would see the light of day until February 2021 at the earliest, and some later still. The Company was able to frame the launch as a success and to coverup the numerous problems that had occurred including that everyone aboard had nearly died because of a chain of human errors and a culture of disregarding inspections.

169.    According to Schmidle, Ericson escalated his concerns following this incident to the Board of Legacy VG in May 2019. Ericson spoke on the phone with an unidentified board member and then was invited to brief Legacy VG's Board's safety committee. Schmidle said that Ericson told the Legacy VG Board that "failures in the maintenance organization were making the program unsafe and that if something didn't change someone was going to get killed."

170. The Legacy VG Board did commission a report by former Boeing executive Dennis O'Donoghue ("O'Donoghue") in response Ericson's concerns. O'Donoghue concluded that Unity was safe to fly.

171. Ericson was not satisfied with this and felt that Defendant Moses was not taking his concerns seriously. On June 10, 2019—just a month before the Merger was announced—he told Defendant Whitesides that he was resigning. Schmidle wrote that "Whitesides looked stricken; his vice president of safety was resigning because he'd lost confidence in the safety regime."

### The Known, Undisclosed Problems with Eve and Unity

172. Legacy VG's vehicles, which after the Merger were the Company's vehicles, suffered from numerous known safety issues. Among these issues were that: (1) the vehicles were not designed for commercial purposes; (2) they lacked key engineering and other technical documentation; (3) Legacy VG (and later Company) personnel did not adequately keep track of changes made to the vehicles and their components; (4) maintenance on the vehicles was regularly deferred in an attempt to stick to planned flight schedules; (5) cracks developed on both vehicles after every test flight; (6) the Unity's flight control system was rudimentary; and (7) the vehicles were subject to an inadequate inspection regime. While these issues began under Legacy VG's watch, they continued into the Relevant Period and through the Merger in October 2019. Thus, Eve and Unity still suffered from these problems as Virgin Galactic's vehicles. Despite these issues being known internally, they went unresolved and undisclosed even as Legacy VG, and then Virgin Galactic, embarked on more and more test flights.

### The Eve and Unity are Not Designed for Commercial Use

173. Plaintiffs' counsel in the Securities Class Action interviewed eight former employees of Legacy VG/Virgin Galactic or The Spaceship Company—a Legacy VG/Company

subsidiary. Statements from these eight former employees are contained in the Securities Class Action's "[Corrected] Amended Class Action Complaint for Violation of the Federal Securities Laws" (the "Class Action Complaint"). The statements attributed to the various former employees ("FE") below come from their statements in the Class Action Complaint. The FEs corroborate the many problems facing the Eve and Unity vehicles.

174.    One such former employee, mentioned above and identified as "FE 6" in the Class Action Complaint, worked at The Spaceship Company from June 2015 through March 2020. Prior to this, FE 6 had worked at Scaled Composites for twenty-six years. FE 6 was responsible for building and maintaining Unity.

175.    FE 6 described Unity and Eve, along with Unity's predecessor Enterprise, as "research vehicles" and "one-off" prototypes that were "home-built" with "very little" formal testing. FE 6 stated that Legacy VG's contract with Scaled Composites clearly and specifically stated that these vehicles were not for commercial use—that they were bare prototypes. In line with this understanding of the vehicles' use, FE 6 stated that Scaled Composites built the vehicles quickly without testing the materials used in construction. They were designed in such a way that belied an expectation that they would not need to survive more than a few test flights.

176.    Nevertheless, FE 6 stated that as the delivery date approached, Scaled Composites realized that Legacy VG **did** plan to use the vehicles commercially.

177.    However, FE 6 stated that Unity, Eve, and Enterprise were not certified under FAA Part 23, meaning their design and operation is not considered industry standard or in line with FAA-recommended best practices. FE 6 stated that with Unity and Eve being five and ten years into service, respectively, that they are beyond their expected useful lives and that Virgin Galactic is "pushing [its] luck" by continuing to use them.

*Key Design Documents Are Lacking or Nonexistent*

178.     Greg V. Meholic ("Meholic") is a Senior Project Leader at The Aerospace Company who has worked twenty-nine years in aircraft and space system development. Statements attributed herein to Meholic appear in the Class Action Complaint to establish what certain industry practices and norms are. Meholic states in the Class Action Complaint that engineering drawings—in the aerospace industry context—are detailed visual depictions of every part of the vehicle including vital information about each part, such as its thickness, chemical composition, specifications, dimensions, and various tolerances. The goal is to have a template to ensure uniform parts and replacements. If a part should fail, engineers can use the information included in such a drawing to troubleshoot the problem and determine how to replace or improve the part. Thus, based on the engineering drawing and the circumstances of the part's failure, an engineer could determine if such part was simply improperly installed or else if it suffered from a manufacture or design defect. Meholic also stated that engineering drawings are usually supported with relevant technical documentation containing descriptions of why a part is made and installed how it is, along with calculations and analysis describing what requirements a part must meet to function in its planned role.

179.     Scaled Composites built Eve and built most of Unity. When Legacy VG terminated its relationship with Scaled Composites, Scaled Composites provided quite limited engineering drawings and technical documentation related to the two vehicles.

180.     FE 6 stated that Legacy VG's contract with Scaled Composites contained no such obligation for Scaled Composites to produce or turn over this type of documentation.

181.     Other former employees corroborated FE 6's account. These included a former Legacy VG technician who worked there from August 2014 until October 2018 (referred to in the

Class Action Complaint as "FE 3"); a former lead Materials & Processes Group Engineer who worked at The Spaceship Company from August 2019 through January 2021 and at Virgin Galactic from January 2021 until August 2021 (referred to in the Class Action Complaint as "FE 8"); and a former Legacy VG (and later Virgin Galactic) Chief Inspector/Quality and Regulatory Compliance who worked in such capacity from June 2019 until December 2020 (referred to in the Class Action Complaint as "FE 1").

182.    FE 3 and FE 8 both stated in the Class Action Complaint that The Spaceship Company completed Unity based on their understanding of the drawing provided by Scaled Composites. FE 1 stated that the drawings provided by Scaled Composites were not detailed and contained no supporting literature explaining, for example, why a part was designed how it was. FE 3 stated that neither the Unity drawings nor the Eve drawings were detailed.

183.    FE 3 stated that "bad blood" had arisen between Legacy VG and Scaled Composites following the fatal accident in October 2014. Due to this bad blood, there was "no significant company-to-company communication."

184.    FE 3 and FE 8 both reported that some of the design drawings provided by Scaled Composites were on napkins or in crayon. Another former employee—identified as "FE 7" in the Class Action Complaint and who worked at Legacy VG as a Manufacturing Engineer from March 2015 until the end of 2017 and as a member of Engineering Support for Structural Systems from January 2018 until January 2019—also saw these drawings on napkins and in crayon. FE 8 reported that some of these napkins had coffee stains and others had beer stains.

185.    Both FE 7 and FE 8 stated that there was no indication that these drawings done on napkin or in crayon had been formalized elsewhere or that the designs depicted had been adequately tested (or possibly even tested at all). FE 3 went so far as to say that Legacy VG simply

put "blind faith" into these drawings and Legacy VG employees had decided to "go by what [a napkin drawing] says" and to hope that it worked in practice.

186.     This was not an easy thing to do. FE 7 stated that the napkin drawings often lacked so much detail that Legacy VG employees could not even decipher what a depicted part was supposed to look like, much less its specific dimensions and properties. Due to this lack of specificity, FE 7 said that when, in other circumstances, parts were found to depart from the drawings, Legacy VG employees would have a hard time deciphering whether this change was due to obsolescence, malfunction, or as an improvement. Thus, FE 7 said that Legacy VG had to perform frequent custom-made stress tests to determine how parts performed. This was time consuming and expensive and would have been avoided had Eve and Unity come with the standard engineering documentation that one might expect of a vehicle intended to carry human beings into space.

187.     Particularly frustrating for Legacy VG employees was Unity's "skin." This outer shell was made of carbon composite materials layered on top of one another. A one-inch section of "skin" that is made of five layers of carbon composite material would behave somewhat differently than a one-inch section of skin composed of ten such layers. In a spacecraft, the weight of components is of crucial importance and the wrong weight in the wrong place can lead to catastrophic failures. On the other hand, too few layers in the wrong place and the forces a spacecraft is subjected to can cause catastrophic failure of a different variety.

188.     FE 1 recalled that, in some cases, Legacy VG employees were not certain whether an area of skin was composed of fifty layers or two hundred layers. Legacy VG had still not yet determined a way to count the layers without cutting out a sample—and in the process destroying the component being examined—by the time FE 1 left in December 2020.

189.     Another area of uncertainty was Eve's wing. FE 3 stated that according to the documentation provided, Eve's wings were supposed to have two vertical "shear webs" inside them that provided support. The existence of these shear webs informed Legacy VG's stress modeling of Eve's wings.

190.     FE 3 stated that Eve had two or three test flights prior to October 2014 and then spent ten to twelve months grounded while Legacy VG personnel strengthened its wings. Then Eve engaged in at least another six test flights in 2016. FE 3 stated that despite all of this testing and working on the vehicle, it was not until 2017 when Legacy VG discovered that ***there was only one—not two—shear webs inside Eve's wings***. FE 3 called this fact "scary" because for years Eve had flown without a structural support that Legacy VG thought was in place the whole time. FE 3 stated that after this fact was discovered, Legacy VG engineers revisited the documents provided by Scaled Composites and indeed found a photo depicting only one, not two, shear webs inside the wing. However, the design drawing had never been updated to include this new development, and Legacy VG had failed to notice.

191.     FE 3 noted that this happened "all the time" with Scaled Composites' drawings. FE 3 said that Scaled Composites had made "a million [undocumented] changes" to the design as drawn, such that Eve was "nothing like it was supposed to be." Operating under this extreme lack of clarity, FE 3 said Legacy VG engineers often just took a "wild guess" as to whether a repair would work.

192.     FE 8 noted that even by 2021 there were issues that had not been worked out with these design drawings. FE 8 said that there were still things "we thought" were in Eve and Unity that were not, and things they thought were not in Eve and Unity that were. As just one other example, there was a piece of metal in Unity's wings the purpose for which no one at Legacy VG

(or later Virgin Galactic) could determine. While Virgin Galactic personnel thought about removing this extraneous part, they were concerned that to do so would be time consuming and difficult and would cause structural damage to the wings. Thus, the piece was left in despite it not having any known purpose.

*Legacy VG/Virgin Galactic Failed to Keep Track of Components and Changes*

193.    Complicating these design issues was the fact that Legacy VG (and later Virgin Galactic) personnel did not adequately document the changes they themselves made to Eve and Unity. Changes to Eve and Unity went through three tiers of workers. First, the engineers would decide on design changes; then the technicians, like FE 6, would enact the changes to the vehicles; and finally the inspectors would ensure, before and after each flight, that everything was properly installed and lacking in defects.

194.    One former engineer worked at Legacy VG from August 2017 until January 2019 and is identified in the Class Action Complaint as "FE 2." According to FE 2, Legacy VG engineers tracked changes to the vehicles design using a software program called Ultramain. However, according to FE 3, Ultramain was not well-suited to this purpose since it was primarily designed for use with commercial aircraft and their regular maintenance, not experimental vehicles regularly undergoing design changes. Changes to the vehicles' designs in Ultramain could not easily be altered once saved. As work was conducted to implement any changes—which might involve ten technicians working for hundreds of hours—Ultramain did not make it easy to keep track of what tasks were completed and by whom. This lack of tracking generated confusion which sometimes led to no one completing ordered work and sometimes led to technicians conducting duplicative work that was not ordered. For example, FE 3 said that instances of two layers of resin

being applied where the design called for one "absolutely happened" due to the inadequacy of Ultramain.

195.    Ultramain had other problems. Ultramain had a function which allowed a technician who replaced a part to input certain information—like a lot number, serial number, and expiration date for the installed part. However, if a design change were then saved to Ultramain, past notes would be deleted. Then, a lead technician would have to reach out to each technician and hope that they had recorded the deleted information elsewhere or otherwise that they remembered it. FE 3 reported that due to these problems, technicians hated Ultramain "with a passion."

196.    FE 2 noted other problems Legacy VG had with keeping track of vehicle parts. Legacy VG engineers used computer-aided design ("CAD") software in addition to Ultramain. Both software products kept track of parts' serial numbers and other information. However, FE 2 noted that sometimes this information would not match for a given part or that a part might be included in one program but entirely omitted from the other. FE 2 recalled these types of discoveries occurring approximately every week. According to FE 2, this posed a safety risk. Legacy VG often did not know how old a part was or when it was installed. Thus Legacy VG could not easily determine when parts should be replaced or undergo regular maintenance. Often these determinations were made simply by having technicians notice that a part seemed "really worn down" and like it should have been dealt with "months ago."

197.    FE 1 noted similar organizational problems. Legacy VG did not keep one master engineering drawing with all subsequent changes in redline. Nor was there as systemic and organized way of having multiple drawings. Thus, according to FE 1, some parts of the vehicles

had numerous competing drawings. Some of drawings might never have been implemented or approved. The cabin interior had as many as 500 such drawings.

198.    FE 8 stated that the drawings followed a naming convention such that the first drawing of a section of the vehicle might be titled "1" and subsequent redline versions would be titled "1.B" and "1.C". Meaningful enough changes resulted in a new version, "2," and redline edits to it would be called "2.B", "2.C", and so on. However, FE 1 stated that sometimes no one knew which version the operative drawing was. Complicating matters further, there might be two versions titled "1.F" that were not identical. FE 1 stated that—because of the confusion these problems generated—there was a "100%" chance that certain drawings being treated as the operative versions "did not match the reality."

199.    A former technician who worked at Legacy VG from September 2017 through January 2018, identified in the Class Action Complaint as FE 4, provided an example of an engineering drawing not matching reality. FE 4 recalled attempting to install an elevon—a movable surface at the tail of the wing that helps control an aircraft. Another technician saw him struggling to do this and informed him that modifications had occurred that required double or perhaps triple the required force to put the requisite piece into place. This change was not officially documented. Information concerning it was sent via email to a handful of employees and FE 4 was not one of them—despite being the one doing the task. FE 4 reported that when concerns about this incident and similar ones were raised, they were "swept under the rug" and brushed aside as "growing pains."

200.    FE 1 recalled similar problems with wiring in the interior cabin of Unity. The main problem was that the interior of Unity simply did not match the drawings provided by engineers

about where to install certain wires and brackets. Thus, technicians could not install the wiring and brackets in accordance with the drawings and resolving these discrepancies generated delays.

201.    FE 1 also stated that The Spaceship Company contributed to the problem of not keeping accurate records about the vehicles. FE 1 said that technicians would send *used* parts to The Spaceship Company for analysis. Upon their return from The Spaceship Company, the forms filled out by The Spaceship Company's employees sometimes erroneously described these parts as *new*.

202.    FE 7 recalled other problems in this area. FE 7 stated that Legacy VG maintained molds of certain of its parts. However, according to FE 7, Legacy VG did not maintain a "process spec" for the molds nor did it keep adequate documentation of what materials were used with them. Moreover, some molds were broken as part the manufacturing process, yet Legacy VG's substandard documentation prevented the certainty that two molds for the same part were identical. FE 7 stated that although Legacy VG did ultimately change its manufacturing process, neither Legacy VG nor the Company went back and ensured that the previous non-standardized parts were replaced.

203.    FE 2 described a problem created by lack of standardization. Following a post-flight inspection in 2018, Legacy VG discovered that some resin binding certain parts together had developed large cracks as a result of having been exposed to air for too long prior to being used. FE 2 said it was "extremely lucky" the cracks had not gotten any larger, or they may have caused a midair disintegration of the Unity like Legacy VG experienced in 2014. FE 7 stated that, normally, the resin that had cracked would have been tracked following production to ensure that it was installed *before* it was exposed to air for too long—a period of about ten to twelve hours.

However, Legacy VG simply did not have the mechanisms in place to do this or else did not utilize them.

204.    Schmidle—the author of *Test Gods: Virgin Galactic and the Making of a Modern Astronaut*—said of this resin issue that its discovery: "made Stucky uneasy. He was okay flying an imperfect ship if he knew where the imperfections were. But on his spectrum of real versus imagined risks, a bad bond qualified as very real. He shuddered to think about charging through the atmosphere at twice the speed of sound if suddenly one of those air bubbles in the bond popped and caused the boom to shear off."

205.    As a matter of fact, Schmidle described how this issue of resin not properly bonding was not a new one. It had previously occurred at least as early as 2013, with Schmidle writing: "'Heads up', Moses had informed the management team, back in 2013. 'We are finding some deeper issues, including the upper wing skin being debonded in places from the wing spar.'"

206.    Schmidle further described how Legacy VG opted not to test the resin bonds everywhere, as test pilot Stucky thought was wise, but instead chose to merely test one location:

> Stucky suggested the engineers test every bond on the ship by slapping industrial-size suction cups on the outer skins and then trying to pull them off. His recommendation was deemed indelicate. Instead, the maintainers cut panels into the flawed boom, so, with the aid of borescopes, the techs, working blind in narrow crevasses with sometimes only an arm inside the ship, could track their progress on a flat-screen monitor.

207.    To accurately detect cracks in this manner would require skilled borescope technicians. FE 8 stated that the technicians employed by Legacy VG for this purpose were merely "some guys with a borescope."

*Deferred Maintenance*

208.    Prior to test flights, there was a company-wide Flight Readiness Review. FE 2 stated that during the rehearsal of one such review—with Defendant Moses present—one of FE 2's

colleagues presented a slide discussing maintenance that had been deferred to keep to the flight schedule. A Vice President told the colleague not to include this slide. FE 2 said that senior management included numerous National Aeronautics and Space Administration ("NASA") alums and that they knew you could not put "on paper" the admission that maintenance was being deferred to keep to a flight schedule.

209.   FE 2 recalled another incident where safety engineers, including FE 2, wanted to ground Unity while they disassembled and reassembled it to get an accurate understanding of its configuration. Management refused to agree to this and instead ordered that a component audit be conducted even while flights occurred. FE 2 stated that this audit never occurred prior to FE 2's departure.

210.   Meholic stated that, in any event, a rigorous audit is impossible without grounding and disassembling the vehicle given that such an audit would require some parts to be destroyed and replaced and other parts to be removed and have their serial numbers checked and their dimensions and properties recorded.

211.   FE 2 was also made aware of the problem, described above, with the RCS that could result in certain valves being stuck open, the Unity losing control, and all the RCS gas being expended. FE 2 said that engineers sought to immediately fix this issue but that Deputy Director of Engineering, Thom Howell, told them that they could not do so due to an upcoming test flight.

212.   This test flight was completed without incident. But on July 26, 2018, as mentioned, the RCS did fail in the manner anticipated. Only after this flight was the engineering team able to fix the issue and redesign the cockpit to avoid further inadvertent use of the RCS.

213.   Many former employees reported that management's practice of setting, per FE 7, "very unrealistic" deadlines contributed to the constant deferral of basic maintenance. FE 3 stated

that he "could not remember a time it didn't happen" that deadlines were ultimately pushed back when a defect was discovered late.

214.    FE 3 recalled in 2017 or 2018, that he discovered cracks on Eve's wing. When he reported these cracks to his supervisor, he was told to do nothing about them because of an upcoming deadline. Instead, FE 3 took his concerns to Engineering, only after which were the repairs made.

215.    FE 4 described a similar occurrence. FE 4 described how loose items in Unity's interior were stored behind a net secured by a carabiner—the type of carabiner one might buy at a store to attach to their keys. Given the extreme conditions Unity is subjected to in takeoff, reentry, and landing, FE 4 asked his manager to utilize a stronger carabiner to prevent a breakage. FE 4 said this was ignored.

216.    In early 2019, the entire Systems Engineering & Integration team—that is, the engineers responsible for identifying and fixing problems such as these—were fired.

*Cracks Develop and the Heat Shield Burns Off Following Each Flight*

217.    FE 1, FE 2, FE 3, and FE 7 each described how new cracks were discovered in Eve after every flight, and FE 2 and FE 7 further stated that Unity also developed cracks after every flight. Thus, engineers (FE 2 and FE 7), technicians (FE 3), and inspectors (FE 1) all knew about this problem.

218.    According to FE 3, the cracks were structural and approximately 90% of them occurred where different parts were bonded by resin. FE 3 said usually the cracks went unaddressed meaning that after a few flights Eve's wings had numerous unfixed cracks.

219.    Meholic stated that cracks in vehicles' wings develop either parallel to the long side—a spanwise crack—or else perpendicular to it—a chordwise crack. In general, spanwise

cracks develop from an unstable or unpredictable feedback loop in the wings' oscillations while chordwise cracks typically develop from too much stress on the wings' skin. Spanwise cracks are typically considered more dangerous.

220.    FE 2 and FE 7 stated that many cracks in Eve's wings were spanwise. FE 7 said the cracks were obvious and that they were found during inspections after every flight. FE 7 further stated that technicians were constantly working on these cracks.

221.    By the time FE 1 and FE 8 had joined, a "huge study" was conducted which determined that areas where the bonding resin was too thick were prone to cracking because they became "extremely brittle." Resin was employed all over both Eve and Unity, and until this study no one was aware of the potential problems it could cause to Eve's and Unity's structural integrity.

222.    Moreover, Unity is attached to Eve with pylons. At 45,000 feet, Eve releases Unity from the pylons. FE 3 stated that there were two pylons, one in front and one in back. FE 3 described the pylons as "just slapped together and not as strong as they were supposed to be." According to FE 3, Virgin Galactic knew that the pylons were a hazard because if Eve had an engine malfunction, Unity might inadvertently disconnect from Eve. If it happened during takeoff, there was a meaningful chance that everyone on board would be killed.

223.    Troublingly, FE 1 and FE 7 stated that these pylons cracked after every flight.

224.    FE 8 stated that the pylons created "monster" issues. Moreover, FE 8 said Eve's horizontal stabilizers had "a lot of issues", including cracks in the bonds. FE 8 said it was these cracks in Eve's horizontal stabilizers that Virgin Galactic's Director of Quality had spent twenty-seven hours looking for.

225.    In addition, FE 7 stated that the heat shield on Unity's tail booms was burned off every time Unity's rockets were deployed into space. However, the heat shield was not to protect

Unity on the ascent, but instead to protect Unity from the heat generated during atmospheric reentry. Thus, every time the Unity reentered the Earth's atmosphere, it was doing so having burned off its heat shield. Nevertheless, Legacy VG (and later Virgin Galactic) merely reapplied the same material over and over despite ©t being ineffective.

*Problems with the Flight Control System*

226.    Normally, a flight control system would have certain redundancies, so that if one part of the flight control system breaks midflight, the pilot can still control the aircraft. FE 7 stated that Unity lacked such redundancies. There was one system of rods and cables physically connected to the yoke in the cockpit. If a key part of this system broke, the pilot simply lost control over part of the vehicle.

227.    This actually occurred during flights, according to FE 7. However, these breakages were merely fixed as they arose, rather than inciting a move to build necessary redundancies or overhaul the flight control system. Inevitably, the next weakest structure would then break, it would be fixed, and the process would repeat itself.

*Vehicle Inspections Were Not Trusted Internally*

228.    Aircraft inspection is a profession where many practitioners have degrees in Aircraft Maintenance Technology and receive certification from the FAA. Eligibility criteria are codified at 14 C.F.R. § 65.9(c) and require applicants to receive mechanics' certifications which require one to pass written, oral, and practical tests; have three years' relevant experience; and then pass a final written test. Aircraft inspection industry certifications have even more rigorous standards.

229.    Yet Legacy VG's inspectors (and Virgin Galactic's) were not trained or certified. Thus, they were ill-suited to detect all but the most obvious of problems with an aircraft. Moreover,

given that Eve and Unity were not like regular production aircrafts and thus did not have a uniform design to adhere to or be compared against, it was an even more difficult task to determine if something was potentially amiss.

230.    FE 1, who led inspections, described them as a "pencil-whipping" exercise. This meant that inspectors were expected to sign off on the vehicles regardless of whether such inspections were done properly or even occurred.

231.    FE 1 stated that Legacy VG (and later Virgin Galactic) inspectors reported to supervisors who worked in production and thus were beholden to deadlines set by production. Thus, the incentive structure for inspectors was to assist production and sign off on inspections to help production meet its deadlines. Ideally, inspectors would be independent and not beholden to supervisors who were primarily interested in keeping their own work moving forward rather than ensuring adequate inspections. FE 1 noted that she wrote up the same crew chief who told FE 3 not to fix the cracks in Eve's wings for signing off on repairs that never happened.

232.    A former employee who worked at The Spaceship Company from 2011 until October or November 2019, first as a Quality Supervisor and Quality Engineer and later as Build Manager for Interiors, is identified in the Class Action Complaint as FE 5. FE 5 stated that James Reed, who had previously worked at Scaled Composites and was subsequently Manufacturing Director at The Spaceship Company was "pre-stamping" work—meaning he was approving of work which had not yet occurred.

233.    FE 8 was tasked with creating better inspection procedures at Virgin Galactic. When FE 8 was onboarded, the Company's procedures were all contained in an eight-page document titled: Process Specification 100.13 ("PS-13"). PS-13 lacked certain details, for

example, what constituted a passing inspection. Moreover, according to FE 8, PS-13 was not well organized despite its very-short length and was more of a "garbage dump" of information.

234.    FE 1 stated that when she joined in June 2019, Legacy VG had no dedicated or trained visual inspectors or non-destructive testers. Dedicated visual inspectors are trained in how, and where, to visually inspect vehicles to make sure there are no issues. Likewise, non-destructive testers are trained in how to conduct tests on vehicles, like ultrasound and vibrational testing, that allow the tester to gather data about the vehicle and its components without the need to destroy any part of the vehicle. For parts situated deep in the interior of a vehicle, a non-destructive test may be the only real way to gather meaningful information about it, aside from disassembling the vehicle (which might take a very long time) or engaging in destructive testing.

235.    FE 8 further noted that when he joined Virgin Galactic, there were no trained borescope technicians. Borescopes are inserted into cracks and navigated through them to determine things like their length, width, origin, and termination. They require certain expertise to use well. For example, a trained borescope technician could determine that what appears to be a shadow to the untrained eye was actually a crack (or conversely that what appeared to be a crack was actually just a shadow). By using "just a guy with a borescope" rather than trained borescope inspector, Virgin Galactic ran the risk of missing things in analyzing cracks on Eve and Unity. This is of particular concern given that Eve and Unity developed new cracks *after every flight*.

236.    FE 1 stated that Virgin Galactic's use of Quality Management System ("QMS") software was also lacking. The QMS software stored data related to the number of quality and safety tickets issued by inspectors and technicians, the number of tickets considered "open," and the number that had been "closed." FE 1 stated that Director of Safety Tim Logan extracted open tickets relating to human errors from the QMS software and moved them to a tracking spreadsheet.

Once these tickets were on the tracking spreadsheet, they were no longer considered open within the QMS software. That is, the QMS software categorized them as closed. Yet substantively nothing was done to address the tickets; they were simply recategorized and moved from QMS to a spreadsheet.

237.    FE 1 reported that she and her team sometimes would write up the same safety issue five or six times, and in the subsequent reports they would note that they had already reported the issue. However, for issues already moved to the spreadsheet, these subsequent entries were not entered into the QMS software. FE 1 stated that her efforts to meaningfully improve the Company's inspection program were not fruitful and indeed that the problem of inspections being treated as a nuisance rather than a critical component of operations actually worsened with time as flights became more frequent.

238.    FE 8 also described the existing inspection regime as a ticking the box exercise. One way of detecting fuselage defects involves tapping the fuselage and listening to ensure that it sounds right. FE 8 stated that this technique is only for certain layers of fuselage, measuring in the thousandths of an inch. Nevertheless, FE 8 stated that he saw this technique performed on one-inch-thick sections of fuselage and saw one such test—which requires extremely close listening to detect small variations in sound—conducted next to an operating power sander.

239.    Deficiencies with the inspection regime aside, FE 8 also reported that sometime no one bothered to wait for inspection results. FE 8's responsibilities included testing new parts after they were received by Virgin Galactic but before they were installed on Eve or Unity. The full results of an inspection on a new part might take a week to produce. However, the new part would be installed before these results came.

240.     Likewise, the results of past inspections were repeatedly ignored. FE 8 stated that after Defendant Branson flew to space in July 2021, Virgin Galactic's Director of Quality personally spent twenty-seven hours looking for cracks. The inspection team had uncovered and reported cracks after every flight for years, but these inspections had simply been ignored.

241.     In addition, FE 1 stated that her inspection team often worked twelve-hour days, seven days a week, especially before flights. Given the distance they were required to live from the launch site in case of an explosion, many members of the team had as much as three hours of additional commuting each day. FE 1 stated that with so much working time and just nine hours a day spent not working or commuting, her team would become "frazzled" and prone to mistakes.

242.     Finally, the Company's *destructive* testing methods also suffered from deficiencies according to FE 7. Other companies maintain spare parts for testing and validation as well as to assist in redesigns. Such companies might have two or three such redundant parts for this purpose. The benefit of having extra parts to run tests on is the ability to engage in "static testing" which involves subjecting a part to various stressors to see if the part will break. Static testing provides valuable information about a given part but is likely to damage or destroy the part. Thus, conducting these tests on a new, spare part is preferable. However, because the Company did not have multiple spares to submit to testing, a part which passed its tests would be installed into the vehicles, even though the very act of testing may have weakened them.

*          *          *

243.     As described above, while these problems started at Legacy VG prior to the Relevant Period, they continued through the Relevant Period and through the Merger. In fact, Eve and Unity were still suffering from safety defects when the Company ultimately cancelled its

remaining test flights until late in 2022 in a press release on October 14, 2021, at the end of the Relevant Period.

244.    The Company's flights were considered so unsafe that even Company employees did not want to fly on them. In March 2020, according to FE 6, Virgin Galactic started an in-house flight lottery, ostensibly to reward employees by giving them a chance to fly to space in Unity. FE 6 stated that, as a person with responsibility over Unity's build and maintenance, he was "scared" to fly in it because it was "poorly built[.]" He was also concerned by Company employees' lack of "attention to detail" and he did not have "faith" in Unity's structure. For these reasons, FE 6 said his response to being eligible for the lottery was "h*** no."

**False and Misleading Statements**

245.    While the foregoing problems were affecting Eve and Unity, the SCH Defendants and certain of the other Individual Defendants, including Defendants Branson, Whitesides, Austin, Kreeger, Lovell, Mattson, and Ryans, were primarily concerned with effecting the Merger. Thus, they were motivated to conceal these issues at Legacy VG to close the Merger on terms favorable to themselves personally. After the Merger, the Individual Defendants continued to conceal these issues, which continued to exist at Virgin Galactic, to make the Company appear a safer investment than it was, artificially inflating the Company's securities.

*July 9, 2019 Press Releases and Letters*

246.    On July 9, 2019, Legacy VG and SCH issued a joint press release announcing the planned Merger. This press release stated:

> *VG believes it has now reached an inflection point in its development as it progresses towards launching commercial operations. In particular, by demonstrating the repeatability of the full flight profile through the completion of two crewed spaceflights, VG believes it has overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service.*

(Emphasis added.)

247.    The press release continued with a statement attributed to Defendant Branson that:

Great progress in our test flight program means that we are ***on track for our beautiful spaceship to begin commercial service.*** By embarking on this new chapter, ***at this advanced point in Virgin Galactic's development***, we can open space to more investors and in doing so, open space to thousands of new astronauts.

(Emphasis added.)

248.    The press release also quoted Defendant Palihapitiya as saying:

It is a privilege to partner with Sir Richard Branson, a once-in-a-generation visionary, to bring the reality of commercial spaceflight to the world. ***We are confident that VG is light years ahead of the competition.*** It is backed by an exciting business model ***and an uncompromising commitment to safety and customer satisfaction***. I cannot wait to take my first trip to space and become an astronaut.

(Emphasis added.)

249.    That same day, July 9, 2019, SCH filed two letters about Legacy VG with the SEC.

One letter was from Defendant Whiteside while the other was unsigned. Both state under a section

titled "Why and Why Now" that:

***With the clearing of the huge technical milestone which came from demonstrating Unity's full flight profile with two trips to space***, and the subsequent decision that we were ready to move the teams to Spaceport America, we were presented with a few options, and have decided this is the best course for the business.

(Emphasis added.)

250.    Also on July 9, 2019, SCH filed a letter from Defendant Branson about the Merger,

which stated:

Opening Virgin Galactic to further external investment has been on the cards for a while. ***Great progress in our test flight programme means that the remaining hurdles, before our beautiful spaceship starts a full commercial service, are steadily being cleared.*** Having sadly had to pull away from an investment by Saudi Arabia after the murder of journalist Jamal Khashoggi, and then ***having***

**demonstrated the repeatability our full flight profile with two crewed spaceflights**, we had an opportunity to rethink our investment plans.

(Emphasis added.)

251.    The statements from July 9, 2019 identified in ¶¶ 246–250 were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, the statements from July 9, 2019 failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, Legacy VG was not "light years ahead of the competition," did not have "an uncompromising commitment to safety and customer satisfaction," and was not "steadily" clearing "hurdles" to commercial development.

### August 7, 2019 Registration Statement

252.    On August 7, 2019, the Company filed a registration statement with the SEC on Form S-4 (the "Registration Statement"). It was signed by Defendants Palihapitiya, Osborne, Bates, Bain, Wong, Reses, and Ryans. The Registration Statement overstated the efforts that Legacy VG took to ensure the quality and safety of its vehicles and described certain risks to Legacy VG's operations (which the Company would inherit) as hypothetical when they were already happening, stating:

> Unsatisfactory safety performance of our spaceflight systems could have a material adverse effect on our business, financial condition and results of operation.
>
> We manufacture and operate highly sophisticated spaceflight systems and offer a specialized astronaut experience that depends on complex technology. **While we have built operational processes to ensure that the design, manufacture, performance and servicing of our spaceflight systems meet rigorous quality standards,** there can be no assurance that we will not experience operational or process failures and other problems, including through manufacturing or design

defects, pilot error, cyber-attacks or other intentional acts, that could result in potential safety risks. Any actual or perceived safety issues may result in significant reputational harm to our businesses, in addition to tort liability, maintenance, increased safety infrastructure and other costs that may arise. Such issues with our spaceflight systems or customer safety ***could result in delaying or cancelling planned flights***, increased regulation or other systemic consequences. Our inability to meet our safety standards or adverse publicity affecting our reputation as a result of accidents, mechanical failures, damages to customer property or medical complications could have a material adverse effect on our business, financial condition and results of operation.

(Emphasis altered from original.)

253.    The Registration Statement also overstated the efforts that Legacy VG took following the 2014 accident, stating:

Human spaceflight is an inherently risky activity that can lead to accidents or catastrophes impacting human life. For example, on October 31, 2014, VSS Enterprise, an earlier model of SpaceShipTwo manufactured and operated by a third-party contractor, had an accident during a rocket-powered test flight. The pilot was seriously injured, the co-pilot was fatally injured and the vehicle was destroyed. While ***we have taken steps to address the causes of this accident and taken other preventative safety measures***, there is a possibility that other accidents may occur in the future for a variety of reasons, some of which may be out of our control. Any such accident could result in substantial losses to us, including reputational harm and legal liability, and, as a result, could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added.)

254.    The statements contained above in ¶¶ 252–53 were repeated in amendments to the Registration Statement filed with the SEC on September 13 and 25, 2019 and October 3 and 8, 2019 (each signed by Defendant Palihapitiya); in another registration statement filed on February 14, 2020 and again in an amendment filed on February 28, 2020 (signed by Defendants Whitesides and Palihapitiya); in the Form 10-K filed by the Company on February 28, 2020 (signed by Defendants Whitesides and Palihapitiya); in a registration statement filed on May 1, 2020 and again in an amendment filed on May 11, 2020 (signed by Defendants Whitesides and Palihapitiya); in a registration statement filed on August, 3, 2020 (signed by Defendants Colglazier and

Palihapitiya); in the Form 10-K filed by the Company on March 1, 2021 and amended on March 11, 2021 (signed by Defendants Colglazier and Palihapitiya); and in a registration statement filed on May 28, 2021 and amended on June 17, 2021 (signed by Defendants Colglazier and Palihapitiya).

255.    The statements referenced in ¶¶ 252–54 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, it was misleading to state that: Legacy VG and/or the Company had "built operational processes to ensure . . .our spaceflight systems meet rigorous quality standards," that delays were a possibility when they were a certainty, and Legacy VG and/or the Company had "taken steps to address the causes of this accident and taken other preventative safety measures" when there were many known safety problems which Legacy VG and/or the Company was not addressing.

### August 16, 2019 Proxy Statement

256.    On August 16, 2019, the Company filed a proxy statement with the SEC on Schedule 14A (the "August 2019 Proxy Statement"). The SCH Defendants solicited the August 2019 Proxy Statement which contained materially misleading elements.

257.    The August 2019 Proxy Statement requested Company shareholders to vote to, *inter alia*, amend certain documents to extend the time SCH had to complete a merger from September 18, 2019 until December 18, 2019.

258.   The August 2019 Proxy Statement alerted Company shareholders to certain

"Interests of our Sponsor, Director and Officers," which included:

- ***If we do not consummate our initial business combination transaction by September 18, 2019***, which is 24 months from the closing of our IPO, or by the Extended Date if the Extension Amendment Proposal and the Trust Amendment Proposal are approved by the requisite number of votes (or, if such date is further extended at a duly called extraordinary general meeting, such later date), we would: (1) cease all operations except for the purpose of winding up; (2) as promptly as reasonably possible but not more than 10 business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest (less up to $100,000 of interest to pay dissolution expenses and which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (3) as promptly as reasonably possible following such redemption, subject to the approval of our remaining shareholders and our board, dissolve and liquidate, subject in each case to our obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. ***In such event, the founder shares, which are owned by our Sponsor, would be worthless*** because following the redemption of the public shares, we would likely have few, if any, net assets and because our holders of our founder shares have agreed to waive their rights to liquidating distributions from the Trust Account with respect to the founder shares if we fail to complete our initial business combination within the required period.

- In addition, simultaneously with the closing of our IPO, we consummated the sale of 8,000,000 private placement warrants at a price of $1.50 per warrant in a private placement to our Sponsor. The warrants are each exercisable for one ordinary share at $11.50 per share. If we do not consummate our initial business combination by September 18, 2019, or by the Extended Date if the Extension Amendment Proposal and the Trust Amendment Proposal are approved by the requisite number of votes (or, if such date is further extended at a duly called extraordinary general meeting, such later date) then the proceeds from the sale of the private placement warrants will be part of the liquidating distribution to the public shareholders and ***the warrants held by our Sponsor and its affiliate will be worthless.***

- ***Our directors and executive officers may continue to be directors and officers of any acquired business after the consummation of an initial business combination.*** As such, in the future they will receive any cash fees, stock options or stock awards that a post-business combination board of directors determines to pay to its directors and officers if they continue as directors and officers following

such initial business combination. Certain of our directors are currently expected to continue as our directors after the consummation of the VG Business Combination.

- In order to protect the amounts held in the Trust Account*, our Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party (other than our independent auditors) for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the Trust Account to below (i) $10.00 per public share and (ii) such lesser amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, due to reductions in value of the trust assets*, in each case net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under our indemnity of the underwriters of our IPO against certain liabilities, including liabilities under the Securities Act.

- A party related to our Sponsor and certain of our officers and directors has advanced funds to us for working capital purposes, including $405,124 as of March 31, 2019. These advances are non-interest bearing, unsecured and due on demand. If we do not complete our initial business combination within the required period, we may use a portion of our working capital held outside the Trust Account to repay such advances and any other working capital advances made to us, but no proceeds held in the Trust Account would be used to repay such advances and any other working capital advances made to us, and such related party may not be able to recover the value it has loaned us and any other working capital advances it may make.

(Emphasis added.)

259. The August 2019 Proxy Statement failed to disclose that, due to the SCH Defendants' conflicts of interest, they were planning the Merger on terms that were unfavorable to the Company given Legacy VG's involvement in the Unsafe Flight Misconduct. That is, the SCH Defendants were engaged in the Overpayment Misconduct to benefit themselves at the expense of the Company and its shareholders.

260. Due to the foregoing false and misleading elements of the August 2019 Proxy Statement, Company shareholders approved the necessary changes to Company documents to extend the deadline to effect a merger.

*September 5, 2019 Analyst Day Presentation*

261.    On September 5, 2019, SCH filed a "Analyst Day Presentation" with the SEC. This presentation contained the following slide which touted, *inter alia*, the "safety, reliability and maintainability" of Legacy VG's vehicles and the "[p]rudent planned maintenance" Legacy VG undertook:



262.    The statements reference in ¶ 261 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, the statements failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay.

### October 10, 2019 Proxy Statement

263.    On October 10, 2019, the Company filed the Merger Proxy Statement with the SEC. The SCH Defendants solicited the Merger Proxy Statement which contained materially misleading elements.

264.    The Merger Proxy Statement requested Company shareholders to vote to, *inter alia*, approve numerous proposals necessary to effect the Merger; elect Defendants Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, Ryans, and Whitesides to Virgin Galactic's Board; approve the issuance of Virgin Galactic stock to Vieco US (i.e., Defendant Branson) and Defendant Palihapitiya; approve the 2019 Incentive Award Plan (the "2019 Plan") under which certain Individual Defendants would be eligible to receive compensation; and approve a repurchase of up to $200 million worth of Vieco US's (i.e., Defendant Branson's) shares of Virgin Galactic common stock.

265.    The Merger Proxy Statement overstated the efforts that Legacy VG took to ensure the quality and safety of its vehicles and described certain risks to Legacy VG's operations (which the Company would inherit) as hypothetical when they were already happening, stating:

> Unsatisfactory safety performance of our spaceflight systems could have a material adverse effect on our business, financial condition and results of operation.
>
> We manufacture and operate highly sophisticated spaceflight systems and offer a specialized astronaut experience that depends on complex technology. ***While we have built operational processes to ensure that the design, manufacture, performance and servicing of our spaceflight systems meet rigorous quality standards,*** there can be no assurance that we will not experience operational or process failures and other problems, including through manufacturing or design defects, pilot error, cyber-attacks or other intentional acts, that could result in potential safety risks. Any actual or perceived safety issues may result in significant reputational harm to our businesses, in addition to tort liability, maintenance, increased safety infrastructure and other costs that may arise. Such issues with our spaceflight systems or customer safety ***could result in delaying or cancelling planned flights***, increased regulation or other systemic consequences. Our inability to meet our safety standards or adverse publicity affecting our reputation as a result of accidents, mechanical failures, damages to customer property or medical complications could have a material adverse effect on our business, financial condition and results of operation.

(Emphasis altered from original.)

266.     The Merger Proxy Statement also overstated the efforts that Legacy VG took

following the 2014 accident, stating:

> Human spaceflight is an inherently risky activity that can lead to accidents or
> catastrophes impacting human life. For example, on October 31, 2014, VSS
> Enterprise, an earlier model of SpaceShipTwo manufactured and operated by a
> third-party contractor, had an accident during a rocket-powered test flight. The pilot
> was seriously injured, the co-pilot was fatally injured and the vehicle was
> destroyed. As part of its 2015 accident investigation report, the National
> Transportation Safety Board (the "NTSB") determined that the probable cause of
> the accident related to the failure by a third-party contractor to consider and protect
> against the possibility that a single human error could result in a catastrophic hazard
> to the vehicle. After the accident, we assumed responsibility for the completion of
> the flight test program and submitted a report to the NTSB that listed the actions
> we were taking for reducing the likelihood and effect of human error. This included
> modification of the feather lock control mechanism to add automatic inhibits that
> would prevent inadvertent operation during safety critical periods of flight. ***We
> have implemented and repeatedly demonstrated the efficacy of these actions,
> including implementing more rigorous protocols and procedures for safety-
> critical aircrew actions, requiring additional training for pilots that focuses on
> response protocols for safety critical actions, and eliminating certain single-point
> human performance actions that could potentially lead to similar accidents. We
> believe the steps we have taken are sufficient to address the issues noted in the
> NTSB's report;*** however, it is impossible to completely eliminate the potential for
> human error, and there is a possibility that other accidents may occur in the future
> as a result of human error or for a variety of other reasons, some of which may be
> out of our control. Any such accident could result in substantial losses to us,
> including reputational harm and legal liability, and, as a result, could have a
> material adverse effect on our business, financial condition and results of
> operations.

(Emphasis added.)

267.     The statements reference in ¶¶ 265–66 above were materially false and misleading

and failed to disclose the facts necessary to make the statements made not materially false and

misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were

engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight

Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer

experienced such great damage due to human error that it would take fourteen months to replace,

engendering delay. For these reasons, it was misleading to state that: Legacy VG had "built operational processes to ensure . . .our spaceflight systems meet rigorous quality standards," that delays were a possibility when they were a certainty, and that "the steps" Legacy VG "ha[s] taken are sufficient to address the issues noted in the NTSB's report" when there were many known safety problems which Legacy VG was not addressing.

268.    Due to the false and misleading elements of the Merger Proxy Statement, Company shareholders voted to: (i) approve numerous proposals necessary to effect the Merger; (ii) elect Defendants Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, Ryans, and Whitesides to Virgin Galactic's Board, allowing them to continue or being breaching their fiduciary duties to the Company; (iii) approve the issuance of Virgin Galactic stock to Vieco US (i.e., Defendant Branson) and Defendant Palihapitiya; approve 2019 Plan under which certain Individual Defendants would receive compensation that was unjust in light of their misconduct; and (iv) approve a repurchase of up to $200 million worth of Vieco US's (i.e., Defendant Branson's) shares of Virgin Galactic common stock, unjustly enriching him in light of his misconduct.

***October and November 2019 Interviews***

269.    On October 16, 2019, *Bloomberg Markets: The Close* interviewed Defendant Branson, which interview contained the following exchange:

> **Q**: Well, the spaceship looks amazing and I'm sure it's comfortable as well. I want to go on a little bit to find out how the test flights are going so far, because I believe you're currently carrying out these test flights. ***Give us a sense of the frequency of the test flights and how far they travel and what you've learned so far from them.***
>
> **Branson**: So, we've had an incredible few months. We're the only space company in America, including NASA, to put people into space since 2009. ***We put five – we made five new astronauts. And, so, now what they're doing is fitting out the interior of the spaceship for passenger use, moving the mothership and the spaceship to our lovely space port in New Mexico.*** We'll then do a few more test flights. ***Then next year I'll go up, and then we'll start putting people up.*** And, so, we've got an exciting few months ahead.

(Emphasis added.)

270.    On October 28, 2019, *Bloomberg* interviewed Defendants Branson and Whitesides,

which interview contained the following exchange:

**Q:** Talk to me about becoming a public company, because it seems an industry that perhaps should be private. There's going to be a lot of scrutiny, I guess, about what you guys are doing, and ***it just seems like it's always going to be one accident, one crash away from oblivion. So, what was the logic to becoming a public company?***

**Branson:** Well, we spent fifteen years developing the company as a private company, and there came a stage where we felt "Let's involve the public. Let's involve institutions" to help us on to the final stage.

What's been gratifying is that many of the biggest institutions in the world have been to the space port, have been to the Mojave, they've seen the spaceships, the way that rockets are built, and they feel comfortable, I think, with the job our team has done over the last fifteen years.

***I think the other thing, which I think George can talk to, is just how safe our spaceship company is, in the way it's been built. Do you want to touch on that, George?***

**Whitesides**: Sure. I mean, what's exciting, is that ***we've been flight testing these vehicles, for now, nearly ten years, and we believe we have an architecture that is extremely reliable and also has aspects that are very suited to the customer experience.*** For example, taking off from a runway, landing on a runway. Those are things that I think will have a very nice, smooth start and ending to the customer experience. And, then, our rocket motor is actually the simplest and, thus, safest – we think – human-rated rocket motor for our class of rocketry. So, for all these reasons we feel really good about the system.

(Emphasis added.)

271.    During this same October 28, 2019 interview, Defendant Branson said:

[S]uccess is creating the world's first space company, and it is the first space company to float on the stock exchange, and it's the first commercial space company to spend five people into space. So, we've had an extraordinary few months and ***next year I'll be going into space, and we'll be starting to send a lot of people into space.***

(Emphasis added.)

272.    Defendant Branson also said: "[W]ell, think, we have the advantage of having already put people into space and we've made five new astronauts; there haven't any others made on American soil since 2009. And, so, we have a tested and tried system that is performing well."

273.    Later, on November 20, 2019, Defendant Palihapitiya stated to *CNBC* that commercial flights were slated to "***begin in about six to nine months***" and that he thought "the story of Virgin is just so new that it hasn't been written yet. ***We'll start commercial operations in the middle of next year***, so the full-fledged business value will become apparent very quickly to a lot more people at that point." (Emphasis added.)

274.    The statements contained in ¶¶ 269–73 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, it was false and misleading to state that the Company had "an architecture that is extremely reliable and also has aspects that are very suited to the customer experience" and that flights would begin in the middle of 2020 when they would not be due to these undisclosed problems.

***December 13, 2019 Press Release***

275.    On December 13, 2019, the Company issued a press release on its website titled "Reflecting on a Remarkable Year." The press release touted the supposed success of the Company's first passenger flight in February 2019, stating:

***Virgin Galactic reaches space for the second time***

82

***Ten weeks after our first flight to space, we did it again, travelling higher and faster than ever before and, for the first time, with a third crew member on board.*** This flight saw two more of our pilots, Dave Mackay and Mike 'Sooch' Masucci, become commercial astronauts, with Chief Pilot Mackay entering the record books as the first Scot in space. Our Chief Astronaut Instructor, Beth Moses, flew as the third crew member to carry out a live evaluation of cabin dynamics – floating freely in zero gravity. She became the first woman to fly on board a commercial spaceship and had the coveted honor of being awarded the title of Commercial Astronaut 007.

(Emphasis added.)

276.    The December 13, 2019 press release contained a link to a February 22, 2019 press release by Legacy VG about the first time it reached space, which press release stated:

In its fifth supersonic rocket powered test flight, Virgin Galactic reached space for the second time today in the skies above Mojave CA. Spaceship VSS Unity reached its highest speed and altitude to date and, for the first time, carried a third crew member on board along with research payloads from the NASA Flight Opportunities program.

This space flight means Chief Pilot Dave Mackay and co-pilot Michael "Sooch" Masucci become commercial astronauts and the 569th and 570th humans in space. Beth Moses, Virgin Galactic's Chief Astronaut Instructor, flew as the third crew member in a first, live evaluation of cabin dynamics. She is the 571st person to fly to space and the first woman to fly on board a commercial spaceship.

In addition to this element of envelope expansion, VSS Unity flew higher and faster than ever before, as its world record-holding hybrid rocket motor propelled the spaceship at Mach 3.04 to an apogee of 295,007ft.

The crew enjoyed extraordinary views of Earth from the black skies of space and, during several minutes of weightlessness while the pilots "feathered" the spaceship in preparation for a Mach 2.7 re-entry, Beth floated free to complete a number of cabin evaluation test points. ***The human validation of data previously collected via sensors, and the live testing of other physical elements of the cabin interior, are fundamental to the provision of a safe but enjoyable customer experience.***

The glide back home was followed by a smooth runway landing and a rapturous reception from the crowd on the flight line, which included staff and some of Virgin Galactic's 600 Future Astronaut customers.

Chief Pilot Dave Mackay, a born and bred Scotsman as well as an ex-RAF test pilot and Virgin Atlantic Captain, led his crew of newly qualified astronauts from VSS Unity accompanied by a kilted piper.

Today's flight notched several additional firsts for the industry: The flight was the first time that a non-pilot flew on board a commercial spaceship to space, and it was the first time that a crew member floated freely without restraints in weightlessness in space onboard a commercial spaceship; it was the first time that three people flew to space on a commercial spaceship, and Dave Mackay became the first Scottish-born astronaut (Brian Binnie, who was raised in Scotland, flew to space in 2004).

Addressing colleagues and guests Dave said: "Beth, Sooch and I just enjoyed a pretty amazing flight which was beyond anything any of us has ever experienced. It was thrilling yet smooth and nicely controlled throughout with a view at the top, of the Earth from space, which exceeded all our expectations. ***I am incredibly proud of my crew and of the amazing teams at Virgin Galactic and The Spaceship Company for providing a vehicle and an operation which means we can fly confidently and safely***. For the three of us today this was the fulfillment of lifelong ambitions, but paradoxically is also just the beginning of an adventure which we can't wait to share with thousands of others."

Sir Richard Branson said: "***Flying the same vehicle safely to space and back twice in a little over two months, while at the same time expanding the flight envelope, is testament to the unique capability we have built up within the Virgin Galactic and The Spaceship Company organizations.*** I am immensely proud of everyone involved. Having Beth fly in the cabin today, starting to ensure that our customer journey is as flawless as the spaceship itself, brings a huge sense of anticipation and excitement to all of us here who are looking forward to experiencing space for ourselves. The next few months promise to be the most thrilling yet."

(Emphasis added.)

277.    The statements contained in ¶¶ 275–76 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, it was false and misleading to tout the February 2019 flight as one that "means we can fly confidently and safely" when the substantial safety issues with that flight, including that everyone aboard nearly died, was omitted.

*February 25, 2020 Press Release and Earnings Call*

278.     On February 25, 2020, the Company issued a press release and held an earnings

call to discuss its financial results for the quarter and full year ended December 31, 2019. The press

release contained the following statement from Defendant Whitesides:

> *"Throughout 2019, we continued to achieve key milestones in our mission to open access to space in a safe, innovative and affordable way,"* said George Whitesides, Chief Executive Officer of Virgin Galactic. "During the fourth quarter, we took major steps toward reaching that goal by completing our transaction with Social Capital Hedosophia and becoming publicly listed on the NYSE, as well as building operational readiness at Spaceport America in New Mexico. *The progress we made in 2019,* combined with the high level of interest from potential customers*, underpin the steps we are taking toward reopening ticket sales. We are continuing to build on our strong momentum as we enter the most exciting chapter of our story to date and prepare for commercial launch."*

(Emphasis added.)

279.     On the earnings call the same day, Defendant Whitesides also said: "We followed

[the December 2018 flight] up by having the first non-pilot crew member flown on a commercial

space vehicle on February 22, 2019. Beth Moses, our chief Astronaut Instructor, *completed her*

*first successful space flight,* becoming the first non-pilot crew member to fly on a commercial

space vehicle[.]" (Emphasis added.)

280.     Later on the call, the following exchange occurred:

> **Q**: What are the key gating items from among those three [flight test, customer experience, and readying the vehicles] that you need to get through to get this first commercial flight? And are you still on schedule for mid-summer? It sounded before like – the schedules influx a little bit as you get everything as perfect as you need.

> Whitesides: Yeah. Well, as you know, *our number one priority is to fly safely, and not just Sir Richard but anybody we fly whether it's the pilots that we fly or employees that we might fly in the late test program, that's our number one priority.* What we're affirming today as you know that our number one priority is to fly Richard Branson into space on a commercial flight in 2020. That's what our entire organization is really that they know that that's the top priority.

(Emphasis added.)

281.    The statements contained in ¶¶ 278–80 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, it was false and misleading to tout the February 2019 flight as a success, to describe safety as the Company's number one priority, and to state that Defendant Branson would be flying into space in 2020, which was unrealistic at the time given the delays engendered by the many problems besetting the Company's operations and the Eve and Unity vehicles.

### April 20, 2020 Proxy Statement

282.    On April 20, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans solicited the 2020 Proxy Statement which contained material misstatements and omissions.

283.    The 2020 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1) elect Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans to the Board and (2) approve, in an advisory capacity, the compensation of, among others, Defendants Whitesides and Moses.

284.    The 2020 Proxy Statement said of the "Board Role in Risk Oversight" that:

The Board of Directors has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to the Company. *A fundamental part of risk oversight is not only understanding the material risks a company faces and the*

*steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. The involvement of the Board of Directors in reviewing our business strategy is an integral aspect of the Board's assessment of management's tolerance for risk and its determination of what constitutes an appropriate level of risk for the Company.* While the full Board has overall responsibility for risk oversight and is currently overseeing the Company's business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by its audit committee, compensation committee and nominating and corporate governance committee. Each of the committees regularly reports to the Board.

*The audit committee assists the Board in fulfilling its risk oversight responsibilities by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements, our enterprise risk management program and our cyber and data security risk management.* Through its regular meetings with management, including the finance, legal, internal audit, tax, compliance and information technology functions, the audit committee reviews and discusses significant areas of our business and summarizes for the Board areas of risk and the appropriate mitigating factors. *The safety committee assists the Board in matters related to safety arising as a result of the Company's business and operations and the processes used to mitigate key safety risks.*

*Through its regular meetings with management and other advisers, its review of the Company's policies and safety audits and results and on-site visits to the Company's facilities and other oversight responsibilities, the safety committee oversees key safety risks.* The compensation committee assists the Board by overseeing and evaluating risks related to the Company's compensation structure and compensation programs, including the formulation, administration and regulatory compliance with respect to compensation matters, and coordinating, along with the Board's Chair, succession planning discussions. The nominating and corporate governance committee assists the Board by overseeing and evaluating programs and risks associated with Board organization, membership and structure and corporate governance. In addition, our Board and its committees receive periodic detailed operating performance reviews from members of management.

(Emphasis added.)

285.    The 2020 Proxy Statement also said the following about the Company's Code of

Conduct:

We have adopted a code of business conduct and ethics (the "Code of Conduct") that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or

controller or persons performing similar functions. A copy of our Code of Business Conduct and Ethics is available under the under the Governance section of the Investor Information page of our website at *www.virgingalactic.com*, or by writing to our Corporate Secretary at our offices at 166 North Roadrunner Parkway, Suite 1C, Las Cruces, New Mexico 88011. ***We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Conduct on our website rather than by filing a Current Report on Form 8-K.***

(Emphasis added.)

286.    Moreover, the 2020 Proxy Statement said the following regarding incentive compensation under the 2019 Plan: "[W]e adopted the 2019 Plan, under which we may grant cash and equity incentive awards to directors, employees and consultants of our Company and our affiliates, to enable us to obtain and retain services of these individuals, which we believe is essential to our long-term success."

287.    The 2020 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2020 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to engage in Unsafe Flight Misconduct and issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2020 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholder and were thus improperly interested in receiving unjust compensation under the 2019 Plan, not merely seeking to obtain and retain the services of qualified individuals.

288.    The 2020 Proxy Statement was also materially misleading because it failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's

February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay; and (3) the Company failed to maintain internal controls.

289.    Due to the false and misleading elements of the 2020 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, in an advisory capacity, the compensation of, among others, Defendants Whitesides and Moses, which compensation was unjust in light of their breaches of fiduciary duty.

### *May 5, 2020 Earnings Call*

290.    On May 5, 2020, the Company held an earnings conference call to discuss its financial results for the quarter ended March 31, 2020. On that call, Defendant Whitesides said:

> Turning to Slide 7. Let me start briefly highlighting some of the key milestones we achieved in 2019 that demonstrate our progress and pace so far. ***Following our successful launch*** of the first commercial space vehicle to put humans in space in December 2018, ***we flew the first non-pilot crew member, our Chief Astronaut Instructor Beth Moses, on a commercial space vehicle in February 2019.***

(Emphasis added.)

### *June 25, 2020 Press Release*

291.    On June 25, 2020, the Company issued a press release announcing the successful completion of another test flight. The press release contained the following statement from Defendant Whitesides:

> ***I am thrilled with the team's hard work to complete today's test flight successfully. It was an important test that, pending data review, means we can now start preparing the vehicles for powered flight***. Our focus for this year remains unchanged on ensuring the vehicles and our operations are prepared for long-term, regular commercial spaceflight service.

(Emphasis added.)

### July 15, 2020 Call Regarding New CEO

292.    On July 15, 2020, the Company held a call to discuss the appointment of a new

CEO, Defendant Colglazier. During the call, the following exchange occurred:

> **Q**: Okay great. And then just – I think I know the answer to this one. But to me, it seems like a pretty big signal you guys are putting out here today that you feel that the technical risk of the flight test program is largely retired? Is that a correct takeaway for me?

> **Whitesides**: I think it's fair to say that *we are now within spitting distance, and we are in a multi-month march to commercial ops.* So things are going well.

(Emphasis added.)

### July 28, 2020 Promotional Video

293.    On July 28, 2020, the Company issued a promotional video showing the interior of

Unity's cabin. During the presentation, Defendant Colglazier said:

> Today, we're sharing the combination of incredible creativity, unswerving dedication, and total commitment to realizing our dream of opening space, to change the world for good. In a moment, we will be revealing to you for the first time, the interior design of our spaceship cabin. In many ways, the cabin is the design centerpiece of this transformational journey. *It's this cabin that will enable hundreds and then thousands of people to embark on one of the most unforgettable journeys of their lives, that a space flight.* Our astronauts are going to experience the majesty of space from within these cabins walls and they'll be peering out the windows at the beauty of our home planet from the black sky around them.

(Emphasis added.)

294.    Defendant Whitesides continued that:

> Our cabin needs to balance the functional and emotional needs of our customers in a high adrenaline environment, as well as a weightless viewing platform. So every touchpoint has been designed with intuitive usability. *Virgin Galactic Spaceship 2 system is designed to fly both humans and science research payloads to space.* So the cabin design is flexible. We can easily replace the seats with payload racks for specific flights and this importantly means that we can fly researchers with their

experiments, a unique space science lab for affordable and repeatable human-tended science research.

(Emphasis added.)

295.     The statements contained in ¶¶ 290–94 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay. For these reasons, it was false and misleading to say "we can now start preparing the vehicles for powered flight;" to describe commercial flights as within "spitting distance," and to maintain that the Unity was designed, and would soon be ready, to carry thousands of people into space.

**The Truth Begins Emerging as the False and Misleading Statements Continue**

*August 3, 2020 Press Release and Earnings Call*

296.     On August 3, 2020, the Company issued a press release announcing that Defendant Branson would not be flying into space in 2020, despite Defendant Whitesides saying the opposite in the February 25, 2020 earnings call. The press release stated in relevant part:

> Virgin Galactic expects to advance to the next phase of its test flight program with its first powered spaceflight from Spaceport America this fall, with two test pilots in the cockpit. Virgin Galactic then expects to conduct a second powered space flight from Spaceport America, with a crew of two test pilots in the cockpit and four mission specialists in the cabin. Assuming both flights demonstrate the expected results, Virgin Galactic anticipates Sir Richard Branson's flight to occur in the first quarter of 2021.

297.     Of course, it was always unrealistic that Defendant Branson would fly in 2020, given the nearly catastrophic flight in February 2019 that grounded the remaining 2019 test flights, caused a 14-month delay, and necessitated that Legacy VG replace the horizontal stabilizers.

298.     In fact, according to FE 1, because it would have taken even longer to get carbon composite stabilizers—the material the originals were made from—the replacements were made of aluminum. FE 8 noted that the aluminum version weighed 120 pounds more than the originals, almost one percent of Unity's total weight, and that the added weigh engendered further delays as other modifications had to be made to accommodate it.

299.     Moreover, according to FE 1, during this period of grounding, the engineers installed a new digital control system to assist the Unity in controlling excessive vibrations caused by travelling faster than the speed of sound. This installation took months due to engineers not having accurate drawings to work with in attempting to wire the digital control system into the vehicle. Once installed there were, according to FE 1, "so many issue with the digital control[]" system that it took months of calibration and telemetry adjustments to resolve them, contributing to the delay.

300.     On news the Defendant Branson's flight would be postponed, the Company's stock price fell $3.30 or 13.7% to close August 4, 2020 at $20.72 per share.

301.     Despite the announcement of the delay revealing that the Company's operations were not proceeding as quickly as formerly represented, certain Individual Defendants continued to make and cause the Company to make materially false and misleading statements about the Company's business, operations, and prospects.

302.     On an earnings call the same day, August 3, 2020, Defendant Colglazier said: "***As always, safety will remain our central focus*** and we will continue to progress with a step-by-step

diligent approach throughout the test flight program as we prepare for commercial service. As such, our schedule may adjust as we process data from each of our test flights." (Emphasis added.)

### October 14, 2020 Press Release

303.    On October 14, 2020, the Company issued a press release announcing its next powered flight. The press release said, in relevant part:

> In these final preparations we are working through a number of rigorous steps to prepare the vehicles, pilots, teams and facilities, ensuring that *we remain focused on safety as our top priority.*
>
> *            *            *
>
> Preparing VSS Unity for flight also includes a "practice run" for the spaceship, as well as the pilots and teams in mission control. We put Unity through its paces on the ground, testing all systems prior to flight to ensure functionality – including raising the feather, swinging the landing gear, firing the reaction control thrusters, and sweeping the flight control systems through full range of motion. Pre-flight vehicle checks are designed to functionally verify that all systems are working as they should be, prior to the take-off.

(Emphasis added.)

### November 2, 2020 Press Release

304.    On November 2, 2020, the Company issued a press release the statements within which were attributed to Defendant Moses. In this press release, Defendant Moses said:

> *The spaceflight system is designed for rapid commercial turnaround, so it is much better to stay on the side of caution and return to base to understand the data and prepare for another test flight.*
>
> *            *            *
>
> *We've made upgrades to the horizontal stabilizers (known as H-Stabs)*, which are the flight control surfaces on the outboard of the feather booms. *We've also made improvements to the flight control system that commands these Hstabs* to move in response to pilot inputs. We've already flown these improvements on our last two glide flights, and they performed well. Together these mods will enhance the performance of the spaceship and support long-term commercial service.

(Emphasis added.)

*November 5, 2020 Press Release and Earnings Call*

305.    On November 5, 2020, the Company issued a press release and earnings call discussing its financial results for the quarter ended September 30, 2020. The press release, noting the Company's accomplishments, stated that Virgin Galactic had: "Implemented ***upgraded flight control system and upgraded horizontal stabilizers*** on VSS Unity to increase performance during the boost phase of the flight profile." (Emphasis added.)

306.    Moreover, on the earnings call Defendant Moses similarly stated that: "***The horizontal stabilizers,*** also known as h stabs, are the flight control surfaces on the outboard side of the booms*, we've made improvements to these services, as well as upgrading the flight control system that drives them.*" (Emphasis added.)

307.    Defendant Colglazier also stated on that call that: "***We're going to focus on safety first, as we always do***, but we also really want to focus and ensure we get the experience just right." (Emphasis added.)

308.    The statements identified in ¶¶ 302–307 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay; (3) following the destruction of Unity's horizontal stabilizers in February 2019, they were replaced not "upgraded;" and (4) the replacement horizontal stabilizers were made of aluminum rather than composite and as such were inferior. In light of the foregoing, the statements describing the Company as "going to focus on safety first" and that "safety [was]

94

our top priority," as well as the statements touting the "upgrades" to the horizontal stabilizers, were false and misleading.

### December 12, 2020 Test Flight

309.    On December 12, 2020, a Saturday, the Company launched another scheduled test flight. This test flight was supposed to be "powered" as opposed to merely a glide test, meaning that Unity's rocket would be fired.

310.    However, the new digital control system installed while the Unity was grounded emitted electromagnetic interference ("EMI"), which the previous system did not do.

311.    When the flight occurred, Eve took Unity to 45,000 feet as planned and Unity attempted to deploy its rocket. The rocket did not fire due to the EMI from the digital control system, so Unity's pilot glided it down to land.

312.    On Monday, December 14, 2020, the Company issued a press release announcing that the rocket did not ignite and that the Unity glided back to Earth. The Company did not reveal that the EMI from the new digital control system was the cause.

313.    Nevertheless, on December 14, 2020, the Company's share price fell $5.57 or 17.4% to close at $26.47 per share.

### February 1, 2021 Press Release and Washington Post Article

314.    On February 1, 2021, the Company issued a press release stating that it planned a new powered-test flight in February 2021—sometime after February 13, 2021. This would include testing "the remedial work that has been completed since the December 12, 2020 flight when the onboard computer halted ignition of the rocket motor."

315.    On this news, the Company's share price soared to close February 1, 2021 at $53.79.

316.    However, that same day, after markets closed, the *Washington Post* published an article noting that the February 2019 test flight had nearly killed everyone on board. The article contained excerpts from Schmidle's forthcoming book. The article revealed that:

> Richard Branson's **Virgin Galactic had just had its second successful flight to the edge of space**, a daring mission that it said put it one step closer to finally flying tourists and making it the "world's first commercial spaceline."
>
> But when the ground crew wheeled the suborbital spacecraft back into the hangar, **company officials discovered that a seal running along a stabilizer on the wing designed to keep the space plane flying straight had come undone** — a potentially serious safety hazard.
>
> "The structural integrity of the entire stabilizer was compromised," Todd Ericson, a test pilot who also served as a vice president for safety and test, said, according to a soon-to-be-published book. **"I don't know how we didn't lose the vehicle and kill three people."**
>
> This previously unreported account of the flight in February 2019 is contained in "Test Gods: Virgin Galactic and the Making of a Modern Astronaut" by New Yorker magazine journalist Nicholas Schmidle, who spent almost four years embedded with the company.

(Emphasis added.)

317.    The *Washington Post* continued by describing the extent of the damage to the horizontal stabilizer, the subsequent investigation, and Ericson's resignation, stating:

> In the book, Schmidle wrote that **the "seal had disbonded on the way up, as the pressure increased with nowhere to vent," ultimately leaving a "wide gap running along the trailing edge of the right h-stab," or horizontal stabilizer. When Mike Moses, Virgin Galactic's president, missions and safety, saw the gap, "he felt his stomach drop," Schmidle reported. Moses's wife, Beth Moses, Virgin's chief astronaut instructor, had been on the flight.**
>
> After the flight, the company hired an outside aviation expert, Dennis O'Donoghue, to conduct a safety review of the program, and he spent weeks interviewing company officials and poring over records, according to the book. After a month, O'Donoghue, who had served as a test pilot in the Marine Corps and at NASA and also had worked at Boeing, submitted his report. The company, which has signed up more than 600 people for flights that cost as much as $250,000, has refused to make it public.

96

*Virgin Galactic "tried to keep the h-stab problem quiet, worried that it might spook customers,"* Schmidle wrote. That stance concerned Ericson, a former military test pilot who had served as the safety chief at the Air Force Test Flight Center before coming to Virgin Galactic in December 2014, according to his LinkedIn profile.

*"This should have been a Come-to-Jesus Moment, not the kind of thing you brush under the rug," Ericson said, according to the book. Ericson informed the company in June 2019 that he was stepping down as vice president of safety, which concerned George Whitesides, then the company's CEO, who Schmidle wrote was suddenly faced with the prospect that "his vice president of safety was resigning because he'd lost confidence in the safety regime."*

(Emphasis added.)

318.    The *Washington Post* noted the cause of the accident and some of its consequences,

including new "metal" stabilizers, stating:

> [In an interview on February 1, Defendant Moses] said the problem occurred when thermal protection coating was applied incorrectly and ended up blocking vents intended to allow air inside the stabilizer to escape as the atmospheric pressure decreased outside the craft as it flew higher.
>
> "The design of the h-stab wasn't really an issue there," Moses said. "It was an error that occurred in processing on the ground. *Clearly a problem, right? Not something that should be allowed to happen and something we clearly needed to address."*
>
> *                *                *
>
> *At the moment the problem was discovered the teams were concerned, even emotional. "The reaction is, 'Wow, what was that? How could that happen?'"* he said. But investigating the issue and finding the problem "gives us pretty high confidence in our design and our performance on the changes we made since," he said.
>
> *                *                *
>
> But after the 2019 flight, Schmidle reported that Ericson "had concluded that members of the maintenance team were 'pencil whipping' inspections — signing for inspections that were not conducted properly." The inspectors, Schmidle wrote, not only failed to notice that the vents were blocked, causing the seal on the stabilizer to rupture, "but also missed a bag of screws taped to the inside of the h-stab."

He recommended firing the head of maintenance, but Moses refused.

After the February 2019 flight, Virgin Galactic grounded the vehicle and began redesigning the stabilizer and hired a contractor to "build a new one from scratch, out of metal," Schmidle reported, instead of the composite carbon fiber used previously.

(Emphasis added.)

319.    By close of trading on February 2, 2021, the Company's share price had fallen back down to $48.58 per share.

320.    However, even as the truth continued to emerge certain Individual Defendants continued to cause and permit the Company to issue more false and misleading statements.

321.    For example, the *Washington Post* article also quoted Defendant Moses as having stated: "***We thoroughly inspect the vehicle, updating our analysis; we update and critique our performance and make sure we're happy with the results before we go to those next flights[.] We take our time and make sure things are right.***" (Emphasis added.)

322.    Of course, this statement in ¶ 321 was false and misleading and failed to disclose that despite some of the truth emerging, the Company was still engaged in undisclosed aspects of the Unsafe Flight Misconduct, included a lack of adequate inspections and cracks appearing after every flight. This contrasts with the deliberative process Defendant Moses seems to describe which involves "thoroughly inspect[ing] the vehicle" and "tak[ing] our time and mak[ing] sure things are right."

### *February 25, 2021 Earnings Call and Press Release*

323.    On February 25, 2021, the Company held an earnings call on which Defendant Moses again reiterated the Company's supposed commitment to safety, stating: "Our safety culture

is built around the principle that everyone in the company has the ability to call attention to an issue."

324.    Moreover, in a press release this same day, February 25, 2021, the Company revealed that it was still remedying problems related to the rocket ignition failure in December 2020. Specifically, fixing the issue with the digital control system itself created problems which then needed to be fixed. Thus, Virgin Galactic had to push its planned test flights back until May 2021.

325.    On this news, the Company's common stock declined by $5.01 or 11.8% to close February 26, 2021 at $37.23 per share.

### July 2, 2021 CNBC Interview

326.    On July 2, 2021, Defendant Moses was interviewed by the *CNBC* show, *Squawk on the Street*. The interview contained more representations about the Company's supposed safety culture, including the following exchange:

> **Q:** Yeah, what an exciting couple of weeks we have ahead of us. You know, I spoke to Sir Richard earlier this week when your sister company, Virgin Orbit, successfully carried satellites to orbit. And at that time, when I asked him what the game plan was for him to go to space, he said that he was waiting for the engineers to tell me when I can go to space, quote-unquote. You take that, you couple it with the FAA approval last Friday, how long has this plan been in the works?
>
> **Moses:** Well, the plan has been in the works for quite some time because we had this test flight program going on. And as you know, we have four test flights we were planning to do. ***We did our first on May 22nd. And it was excellent and it showed that we are technically ready to go. We did a lot of diligent analysis after that flight. That's the same data that we gave to the FAA. And as you mentioned, that's what the FAA used as the basis to approve our commercial license going forward. And when we finished that analysis, we knew we would be pivoting from focus on the technical side of the flight test to the focus on the cabin experience and what the astronaut experience would be like for these next two flights.*** But we had to wait until the technical work was done and Richard was pretty patient about that.

So then as we shift this focus to now the private astronaut experience and the cabin environment, these next two test flights are pretty much going to be the same. We originally had thought we would maybe rehearse and have somebody stand-in for Richard just to kind of show what would be going on. We realized most of that training is done on the ground and so, had a chance to say to Richard, you could go on either of these two flights, which would you prefer? You can kind of imagine what he had to say back. And he's excited to go now that it's ready.

(Emphasis added.)

327.    The interviewer pressed Defendant Moses more on safety, leading to the following

exchange:

**Q:** Safety, it's of the utmost importance. How are you planning for that? What does that look like?

**Moses**: *I would say safety is built in at the foundation of everything we do. And, you know, you mentioned we were originally planning to fly Richard well back like a year ago, and we had more test flights to do, we have more efforts to go, and so we never really worry about the schedule driving anything. We worry about our technical readiness driving everything. And so that's how this company works, that's how we're built, that's where we're embedding in the culture of this. So now that the technical readiness is there and it's there because of the data that shows it's there, and it's there because of the diligence of the team that works on this so hard.* So now that that is ready, it does really give us the ability to focus on the next phase, the cabin experience. And now we're going to get repetition and repeating under our belt on the technical flights. The last flight in May flew just as we wanted it to go so we're just going to keep doing that flight profile and move forward. But this takes us another step to opening the door of making space accessible for far more people than has ever been possible and that's pretty exciting.

(Emphasis added.)

328.    The statements in ¶ 323 and ¶¶ 326–27 were false and misleading and failed to

disclose that the Company was still engaged in undisclosed aspects of the Unsafe Flight

Misconduct, included a lack of adequate inspections and cracks appearing after every flight. This

contrasts with the existence of a "safety culture" at all, and the persistence of such issues challenge

the notion that "everyone in the company has the ability to call attention to an issue." Moreover,

Defendant Moses's statements to the effect that the Company was demonstrating "technical

readiness" and was thus prepared to shift "the focus on the cabin experience and what the astronaut experience would be like" misrepresented how much was still left to fix on the technical side.

### July 11, 2021 Flight, Press Release, and Interviews

329.    On July 11, 2021, the much-awaited flight to take Defendant Branson into space finally occurred. Though another catastrophic failure almost happened, in which the Unity was nearly lost outside its landing cone which would have resulted in a crash landing, this fact would not become public until September 2021. Thus, the Company was able to treat the flight as a resounding success.

330.    That day, the Company issued a press release quoting Defendant Colglazier as stating:

> ***Today is a landmark achievement for the Company and a historic moment for the new commercial space industry. With each successful mission we are paving the way for the next generation of astronauts.*** I want to thank our talented team, including our pilots and crew, whose dedication and commitment made today possible. They are helping open the door for greater access to space – so it can be for the many and not just for the few.

(Emphasis added.)

331.    Later the same day, Defendant Colglazier was interview on *Bloomberg Markets'* *The Close*, during which the following exchanges occurred:

> **Q:** A lot of the event was about Richard, you know, Richard was front and center, but you know, as the CEO of the commercial business, what does today represent for you? What does it allow you to do?
>
> **Colglazier:** Well, two things. I think for the world, it allows us to show that something people never thought was gonna happen in their lifetimes is actually happening now. ***The ability for regular people to be able to go to space and it will take years to really get the scale of it up but I think we showed today what that is going to be like and a taste of that going forward.*** So that was huge. And then at a business level, this was one of the remaining flight tests that we need to do as we move into commercial service. So we've got two more. ***This one was perfect***

*          *          *

**Q:** Was Sunday's event about selling tickets? Was that really what it was about?

**Colglazier**: This event was about showcasing to the world what this Virgin Galactic experience is going to be. ***And this event was part of our incredible safety diligent program to make sure that we go step-by-step so that when we do open this up for commercial service, we've done all that needs to be done. So it's amazing and anchored in safety experience*** and that's what today was about.

(Emphasis added.)

332.    *Bloomberg Markets* was also able to interview Defendant Branson himself, during which interview the following exchange occurred:

**Q:** Well, what does it mean for the company? There was some risk involved. I'm sure that some of your staff looking at me right now were nervous at points.

**Branson**: Well, look, ***the company is 17 years, they've had a number of flawless flights. They've never had any major, major technical issues even, you know, in the last 17 years and this was absolutely and utterly flawless.***

(Emphasis added.)

333.    The statements in ¶¶ 330–32 were false and misleading and  failed to disclose that that the Company was still engaged in undisclosed aspects of the Unsafe Flight Misconduct, included a lack of adequate inspections and cracks appearing after every flight. Another aspect of the Unsafe Flight Misconduct that these statements failed to disclose were the problems with the July 11, 2021 flight itself. In light of these facts, the statements that the launch was "perfect," that the Company maintained an "incredible safety diligent program," and that the Company "had a number of flawless flights" without "any major, major technical issues even" were false and misleading when made.

***July 13, 2021 Proxy Statement***

334.    On July 13, 2021, the Company filed the 2021 Proxy Statement with the SEC. The 2021 Proxy Statement was solicited by Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West and contained material misstatements and omissions.

335.    The 2021 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1) elect by Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West and (2) approve, in an advisory capacity, the compensation of, among others, Defendants Colglazier and Moses.

336.    The 2021 Proxy Statement said of the "Board Role in Risk Oversight" that:

The Board of Directors has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to the Company. ***A fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. The involvement of the Board of Directors in reviewing our business strategy is an integral aspect of the Board's assessment of management's tolerance for risk and its determination of what constitutes an appropriate level of risk for the Company.*** While the full Board has overall responsibility for risk oversight and is currently overseeing the Company's business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by its audit committee, compensation committee and nominating and corporate governance committee. Each of the committees regularly reports to the Board.

***The audit committee assists the Board in fulfilling its risk oversight responsibilities by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements, our enterprise risk management program and our cyber and data security risk management. Through its regular meetings with management, including the finance, legal, internal audit, tax, compliance and information technology functions, the audit committee reviews and discusses significant areas of our business and summarizes for the Board areas of risk and the appropriate mitigating factors. The safety committee assists the Board in matters related to safety arising as a result of the Company's business and operations and the processes used to mitigate key safety risks. Through its regular meetings with management and other advisers, its review of the Company's policies and safety audits and results and on-site visits to the Company's facilities and other oversight responsibilities, the safety committee oversees key safety risks.*** The

> compensation committee assists the Board by overseeing and evaluating risks related to the Company's compensation structure and compensation programs, including the formulation, administration and regulatory compliance with respect to compensation matters, and coordinating, along with the Board's Chair, succession planning discussions. The nominating and corporate governance committee assists the Board by overseeing and evaluating programs and risks associated with Board organization, membership and structure and corporate governance. In addition, our Board and its committees receive periodic detailed operating performance reviews from members of management.

(Emphasis added.)

337.    The 2021 Proxy Statement also said the following about the Company's Code of Conduct:

> We have adopted a code of business conduct and ethics (the "Code of Conduct") that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. A copy of our Code of Business Conduct and Ethics is available under the under the Governance section of the Investor Information page of our website at *www.virgingalactic.com*, or by writing to our Corporate Secretary at our offices at 166 North Roadrunner Parkway, Suite 1C, Las Cruces, New Mexico 88011. ***We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Conduct on our website rather than by filing a Current Report on Form 8-K.***

(Emphasis added.)

338.    The 2021 Proxy Statement also said the following regarding incentive compensation under the 2019 Plan that: "We maintain the 2019 Incentive Plan, under which we may grant cash and equity incentive awards to directors, employees and consultants of our Company and our affiliates, to enable us to attract and retain services, skills and experience of these individuals, which we believe are essential to our long-term success."

339.    The 2021 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to engage in Unsafe Flight Misconduct and

issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholder and were thus improperly interested in receiving unjust compensation under the 2019 Plan, not merely seeking to obtain and retain the services of qualified individuals.

340.    The 2021 Proxy Statement was also materially misleading because it failed to disclose that (1) the Company was still engaged in undisclosed aspects of the Unsafe Flight Misconduct, included a lack of adequate inspections and cracks appearing after every flight; and (2) the Company failed to maintain adequate internal controls.

341.    Due to the false and misleading elements of the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, in an advisory capacity, the compensation of, among others, Defendants Colglazier and Moses, which compensation was unjust in light of their breaches of fiduciary duty.

**The Truth Emerges**

342.    On September 1, 2021, the *New Yorker* published an article disclosing that the Unity had left its landing cone during the July 11, 2021 flight with Defendant Branson, as indicated first by a yellow light—indicating that Unity was about to leave the landing cone—a red safety light—indicating that it had in fact left. The article, written by Schmidle in the first-person, stated that:

> I once sat in on a meeting, in 2015, during which the pilots [who would later pilot]
> the July 11th [2021] mission—Dave Mackay, a former Virgin Atlantic pilot and

veteran of the U.K.'s Royal Air Force, and Mike Masucci, a retired Air Force pilot—and others discussed procedures for responding to an entry glide-cone warning. ***C. J. Sturckow, a former marine and NASA astronaut, said that a yellow light should "scare the s\*\*\* out of you," because "when it turns red it's gonna be too late"; Masucci was less concerned about the yellow light but said, "Red should scare the cr\*p out of you."***

(Emphasis added.)

343.    Nevertheless, Unity stayed outside the cone for 1 minute and 41 seconds, or more than 10% of its glide time. This was in violation of FAA regulations and was extremely dangerous.

344.    The day after the article was published, September 2, 2021, the FAA announced that it was grounding Unity.

345.    On this news, the price per share of the Company's common stock closed on September 2, 2021 at $25.99 per share.

346.    Then, on October 14, 2021, the Company issued a press release stating that a planned demonstration with members of the Italian Air Force was being delayed until the fourth quarter of 2022 due to the results of "recent laboratory-based tests." The press release stated, in relevant part:

> The enhancement program is designed to improve vehicle performance and flight-rate capability for VMS Eve and VSS Unity. In preparation for this work, Virgin Galactic has been performing routine tests and analyses to update its material properties database. This data predicts how materials are expected to perform under certain load and environmental conditions and is used to inform the design and manufacturing enhancements that will support increased flight frequency. ***One of these recent laboratory-based tests flagged a possible reduction in the strength margins of certain materials used to modify specific joints, and this requires further physical inspection.***
>
> As is standard in aerospace test and evaluation practices, Virgin Galactic ships are designed to withstand forces that are substantially higher than those experienced in regular use, providing additional margin and layers of safety. The enhancement program is designed to further increase margins that will enable improved reliability, durability and reduced maintenance requirements when in commercial service. While this new lab test data has had no impact on the vehicles, our test flight protocols have clearly defined strength margins, and further analysis will

106

assess whether any additional work is required to keep them at or above established levels. Given the time required for this effort, the Company has determined the most efficient and expedient path to commercial service is to complete this work now in parallel with the planned enhancement program.

(Emphasis added.)

347.    On this news, the price of the Company's common stock fell over 16.9%, or $4.05 per share, from closing at $24.06 per share on October 14, 2021, to close at $20.01per share on October 15, 2021.

### *Subsequent Developments*

348.    On November 8, 2021, on an earnings call to discuss the Company's financial results for the quarter ended September 30, 2021, the Company revealed that the parts at issue in the October 14, 2021 press release were Eve's launch pylons and horizontal stabilizers.

## <u>DAMAGES TO VIRGIN GALACTIC</u>

349.    As a direct and proximate result of the Individual Defendants' conduct, Virgin Galactic will lose and expend many millions of dollars.

350.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection to those two actions. Such expenditures also include, but are not limited to, legal fees arising from any other actions brought as a result of the Unsafe Flight Misconduct.

351.    Such expenditures also include, but are not limited to, the costs associated with remedying the Unsafe Flight Misconduct, including any costs associated with fixing the many structural and design issues with Eve and Unity that render them unsafe to fly.

352.    In addition, such losses include the value for which SCH was made to overpay for acquiring Legacy VG, which was acquired on terms unreasonable to SCH given the undisclosed truth.

353.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including compensation paid in connection with the consummation of the Merger and under the 2019 Plan.

354.    As a direct and proximate result of the Individual Defendants' conduct, Virgin Galactic has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and other misconduct.

## DERIVATIVE ALLEGATIONS

355.    Plaintiff brings this action derivatively and for the benefit of Virgin Galactic to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

356.    Virgin Galactic is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

357.    Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

358.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

359.    A pre-suit demand on the Board of Virgin Galactic is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West (collectively, the "Director-Defendants") along with nonparty Wanda Sigur (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors that were on the Board at the time of the filing of this complaint.

360.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in Unsafe Flight Misconduct and to make false and misleading statements and omissions of material fact about the same while two of them engaged in insider sales based on material nonpublic information. These actions render the Director-Defendants unable to impartially investigate the charges and decide whether to pursue an action against themselves and the other perpetrators of this scheme.

361.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into

believing the fraud perpetrated by the Individual Defendants, one of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

362.    Additional reasons that demand on Defendant Colglazier is futile follow. Defendant Colglazier has served as the CEO of Virgin Galactic and as a director, since July 2020. The Company provides Defendant Colglazier with his principal occupation for which he receives substantial compensation as detailed above. Thus, as the Company admits, he is a non-independent director. As CEO, Defendant Colglazier is ultimately responsible for the Company's engagement in the Unsafe Flight Misconduct and the many false and misleading statements and omissions that were made following his onboarding. This includes those statements which he personally made in a promotional video, on earnings calls, and in interviews. Moreover, the 2021 Proxy Statement was solicited on his behalf and the false and misleading elements contained therein contributed to his reelection to the Board and to shareholders approving, in an advisory capacity, his compensation. As the Company's highest officer and as a trusted Company director, Defendant Colglazier conducted little, if any, oversight of the schemes to cause the Company to the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Colglazier is a defendant in the Securities Class Action. For these reasons, Defendant Colglazier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

363.    Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a Company director since October 2019. She also serves as Chairperson of the Compensation Committee and a member of both the Audit Committee and Safety Committee. Defendant Austin has received and continues to receive substantial compensation for her role as a director, including $270,280 for the 2020 Fiscal Year and $331,205 in Fiscal Year 2019; these figures include compensation paid under the 2019 Plan. As a trusted Company director, Defendant Austin conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Austin solicited the 2020 Proxy Statement and the 2021 Proxy Statement, the false and misleading elements of which contributed to her reelection to the Board. For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

364.    Additional reasons that demand on Defendant Bain is futile follow. Defendant Bain has served as a Virgin Galactic director since the Merger in October 2019 and prior to this was an SCH director since September 2017. He also serves as Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. In connection with his role as a director of SCH who helped effect the Merger, Defendant Bain received $12,516,000 in stock awards. Moreover, Defendant Bain fills a directorship in Virgin Galactic over which Defendant Palihapitiya retains a right to designate the officeholder. Thus, he is beholden to Defendant Palihapitiya, another primary interested wrongdoer. As a trusted Company director, Defendant Bain conducted little, if any, oversight of the schemes to cause the Company

to engage in the Overpayment Misconduct and the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bain solicited each of the August 2019 Proxy Statement, the Merger Proxy Statement, the 2020 Proxy Statement, and the 2021 Proxy Statement each of which he personally benefitted from. The false and misleading elements of the August 2019 Proxy Statement convinced shareholders to extend the September 2019 merger deadline, allowing the Merger to eventually be effected on terms personally favorable to Defendant Bain. The false and misleading elements of the Merger Proxy Statement led to the approval of the Merger, which resulted in a windfall to Defendant Bain of $12,516,000. The false and misleading elements of both the 2020 Proxy Statement and the 2021 Proxy Statement contributed to his reelection as a director. For these reasons, Defendant Bain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

365. Additional reasons that demand on Defendant Jonas is futile follow. Defendant Jonas has served as a Company director since June 2021. She also serves as a member of the Audit Committee. As a trusted Company director, Defendant Jonas conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Jonas solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to her reelection to the Board. For these reasons, Defendant Jonas breached her fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon her is futile and, therefore, excused.

366.    Additional reasons that demand on Defendant Kreeger is futile follow. Defendant Kreeger has served as a Company director since the Merger in October 2019. In addition, he serves as Chairperson of the Safety Committee and as a member of the Audit Committee. Defendant Kreeger has received and continues to receive substantial compensation for his role as a director, including $267,223 for the 2020 Fiscal Year and $331,205 in Fiscal Year 2019; these figures include compensation paid under the 2019 Plan. His insider sale, which yielded approximately $252,000 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kreeger solicited the 2020 Proxy Statement and the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, Defendant Kreeger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

367.    Additional reasons that demand on Defendant Lovell is futile follow. Defendant Lovell has served as a Company director since the Merger in October 2019. In addition, he serves as Interim Chairperson of the Board following Defendant Palihapitiya's resignation, and as a member of the Safety Committee. Defendant Lovell fills one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder. Thus, he is beholden to Defendant Branson, a primary interested wrongdoer, who controls Vieco US through Virgin Group Holdings Limited. Given his relationship with Defendant Branson and Virgin Group Holdings

Limited—where he is a Partner—the Company admits he is not an independent director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lovell solicited the 2020 Proxy Statement and the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, Defendant Lovell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

368.   Additional reasons that demand on Defendant Mattson is futile follow. Defendant Mattson has served as a Company director since the Merger in October 2019. In addition, he serves as a member of the Safety Committee. Defendant Mattson has received and continues to receive substantial compensation for his role as a director, including $246,147 for the 2020 Fiscal Year and $$327,534 in Fiscal Year 2019; these figures include compensation paid under the 2019 Plan. Defendant Mattson fills one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder. Thus, he is beholden to Defendant Branson, a primary interested wrongdoer, who controls Vieco US through Virgin Group Holdings Limited. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mattson solicited the 2020 Proxy Statement and the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons,

Defendant Mattson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

369.    Additional reasons that demand on Defendant West is futile follow. Defendant West has served as a Company director since February 2021. He also serves as a member of the Safety Committee. As a trusted Company director, Defendant West conducted little, if any, oversight of the schemes to cause the Company to engage in the Unsafe Flight Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant West solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, Defendant West breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

370.    Additional reasons that demand on the Board is futile follow.

371.    As described above, one of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Kreeger engaged in a lucrative insider transaction executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to Defendant Kreeger, and excused.

372.    Demand in this case is further excused because Defendants Kreeger, Lovell, and Mattson are beholden to and controlled by Defendant Branson, a primary interested wrongdoer who was a controlling shareholder during the Relevant Period.[5] Defendant Branson controls their

---

[5] Defendant Branson exercised control over 58.7% of Virgin Galactic's common stock immediately following the Merger, which made him a controlling shareholder. According to the 2021 Proxy Statement, by June 28, 2021, this had been reduced to 23.6%.

continued nomination to the Board per the terms under which the Merger was consummated. In light of this of this control, Defendants Kreeger, Lovell, Mattson cannot impartially consider a demand against Defendant Branson, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Lovell who is also Partner at Virgin Group Holdings Limited. Thus, Defendants Kreeger, Lovell, and Mattson are unable to evaluate a demand with disinterest or independence given Defendant Branson's control over them.

373.    Demand in this case is further excused because Defendant Bain is beholden to and controlled by Defendant Palihapitiya, a primary interested wrongdoer, Defendant Palihapitiya controls his continued nomination to the Board per the terms under which the Merger was effected. In light of this control, Defendant Bain cannot impartially consider a demand against Defendant Palihapitiya, an interested, primary wrongdoer, as Defendant Bain is dependent on Defendant Palihapitiya for his continued, lucrative employment with the Company. Thus, Defendant Bain is unable to evaluate a demand with disinterest or independence given Defendant Palihapitiya's control over him.

374.    The Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. For instance, Director-Defendants Lovell and Kreeger are or were executives within the greater "Virgin" brand, owned by Defendant Branson. Defendant Lovell is a Partner at Virgin Group Holdings Limited and has been since October 2012. He serves on the Board of numerous of its subsidiaries. Defendant Kreeger was CEO of Virgin Atlantic from February 2013 until December 2018, before joining the Board of the Company in October 2019. Defendants Whitesides and Moses also have longstanding

relationships with the greater "Virgin" organization, as both were employed by Legacy VG starting in 2010 and 2011, respectively. Moreover, Director-Defendant Bain was instrumental in effecting the Merger, and he did this in coordination with, *inter alia*, Defendant Branson, who controlled Legacy VG; Defendant Palihapitiya, who controlled SCH; and Defendants Austin, Kreeger, Lovell, Mattson, Ryans and Whitesides, who agreed to be nominees to Virgin Galactic's post-Merger Board. They all stood to benefit from, and did benefit from, the completion of the Merger including through the grant of stock awards connected to the Merger's consummation and through the 2019 Plan, which Company shareholders were deceived into approving. These conflicts of interest precluded Director-Defendants Lovell, Kreeger, Bain, Austin, and Mattson from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon Director-Defendants Lovell, Kreeger, Bain, Austin, and Mattson would be futile.

375.    Defendants Austin, Jonas, Kreeger, and Mattson (the "Audit Committee Directors") served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, the Audit Committee Directors failed to adequately review and discuss the Company's Forms 10-K, Forms 10-Q, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

376.    Defendants Austin, Kreeger, Lovell, and West (the "Safety Committee Directors") served as members of the Safety Committee during the Relevant Period. In violation of the Safety Committee Charter, the Safety Committee Directors caused and/or permitted the Company to

engage in the Unsafe Flight Misconduct. Moreover, the Safety Committee Directors failed to adequately review the status of the Company's safety performance; review and provide input regarding safety issues; assist the Board with oversight of risk management and security processes; review the annual strategy and resources of the Company's safety organization; review the Company's safety policies, systems, and benchmarks against industry standards; review processes designed to mitigate key safety risks; review methods used to communicate the Company's core safety values; review periodic updates on significant safety policy issues in key countries of operation that may materially impact the Company's operations and review management's annual update on the same; review safety audit results, findings, and action plans; and make periodic visits to the Company's facilities and discuss safety issues related to those facilities. Thus, the Safety Committee Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

377.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in the Unsafe Flight Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. In addition, the Director-Defendants failed to secure and/or disclose any waivers of the Code of

Conduct granted by the Board, which constitutes a further violation of the Code of Conduct. Moreover, two of the Director-Defendants Defendants violated the Code of Conduct by engaging in insider trading. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

378.    Virgin Galactic has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Virgin Galactic any part of the damages Virgin Galactic suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

379.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

380.    The acts complained of herein constitute violations of fiduciary duties owed by Virgin Galactic's controlling shareholder, officers, and directors. These acts are incapable of ratification.

381.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Virgin Galactic. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

382.    If there is no directors' and officers' liability insurance, then the Directors will not cause Virgin Galactic to sue the Director-Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

383.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Branson, Palihapitiya, Whitesides, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, Ryans, West, Bates, Osborne, Reses, and Wong for Violations of Section 14(a) of the Exchange Act**

384.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

385.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

386.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

387.    Under the direction and watch of the SCH Defendants, the August 2019 Proxy Statement failed to disclose that, due to the SCH Defendants' conflicts of interest, the SCH Defendants were planning the Merger on terms that were unfavorable to the Company given Legacy VG's involvement in the Unsafe Flight Misconduct. That is, the SCH Defendants were engaged in the Overpayment Misconduct to benefit themselves at the expense of the Company and its shareholders. As a result, the August 2019 Proxy Statement was materially false and misleading.

388.    In the exercise of reasonable care, the SCH Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the August 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the August 2019 Proxy Statement, including but not limited to, whether to approve the necessary changes to Company documents to extend the deadline to effect a merger.

389.    The false and misleading elements of the August 2019 Proxy Statement led to, among other things, shareholders approving the necessary changes to Company documents to extend the deadline to effect a merger.

390.    Under the direction and watch of the SCH Defendants, the Merger Proxy Statement failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; and (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay.

391.    In the exercise of reasonable care, the SCH Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, including but not limited to, approving proposals to effect the Merger, electing Defendants Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, Ryans, and Whitesides to Virgin Galactic's Board; approving the issuance of Virgin Galactic stock to Vieco US (i.e., Defendant Branson) and Defendant Palihapitiya; approving the 2019 Plan under which certain Individual Defendants would be eligible to receive compensation; and approving a repurchase of up to $200 million worth of Vieco US's (i.e., Defendant Branson's) shares of Virgin Galactic common stock.

392.    The false and misleading elements of the Merger Proxy Statement led to, among other things, shareholders approving numerous proposals necessary to effect the Merger; electing Defendants Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, Ryans, and Whitesides to Virgin Galactic's Board, allowing them to continue or being breaching their fiduciary duties to the

Company; approving the issuance of Virgin Galactic stock to Vieco US (i.e., Defendant Branson) and Defendant Palihapitiya; approving the 2019 Plan under which certain Individual Defendants would receive compensation that was unjust in light of their misconduct; and approving a repurchase of up to $200 million worth of Vieco US's (i.e., Defendant Branson's) shares of Virgin Galactic common stock, unjustly enriching him in light of his misconduct.

393. Under the direction and watch of Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans, the 2020 Proxy Statement failed to disclose that: (1) contrary to the 2020 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to engage in Unsafe Flight Misconduct and issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2020 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholder and were thus improperly interested in receiving unjust compensation under the 2019 Plan, not merely seeking to obtain and retain the services of qualified individuals.

394. The 2020 Proxy Statement was also materially misleading because it failed to disclose that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay; and (3) the Company failed to maintain internal controls.

395.    In the exercise of reasonable care, Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, electing Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans to the Board and approving, in an advisory capacity, the compensation of, among others, Defendants Whitesides and Moses.

396.    The false and misleading elements of the 2020 Proxy Statement led to, among other things, shareholders electing Defendants Whitesides, Palihapitiya, Austin, Bain, Kreeger, Lovell, Mattson, and Ryans to the Board, allowing them to continue breaching their fiduciary duties to the Company; and approving, in an advisory capacity, the compensation of, among others, Defendants Whitesides and Moses, which compensation was unjust in light of their breaches of fiduciary duty.

397.    Under the direction and watch of Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West, the 2021 Proxy Statement failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to engage in Unsafe Flight Misconduct and issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholder and were thus improperly interested in

receiving unjust compensation under the 2019 Plan, not merely seeking to obtain and retain the services of qualified individuals.

398.    The 2021 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company was still engaged in undisclosed aspects of the Unsafe Flight Misconduct, included a lack of adequate inspections and cracks appearing after every flight; and (2) the Company failed to maintain adequate internal controls.

399.    In the exercise of reasonable care, Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, electing Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West to the Board and approving, in an advisory capacity, the compensation of, among others, Defendants Colglazier and Moses.

400.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, shareholders electing Defendants Palihapitiya, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West to the Board, allowing them to continue breaching their fiduciary duties to the Company; and approving, in an advisory capacity, the compensation of, among others, Defendants Colglazier and Moses, which compensation was unjust in light of their breaches of fiduciary duty.

401.    The Company was damaged as a result of the material misrepresentations and omissions in the August 2019 Proxy Statement, the Merger Proxy Statement, the 2020 Proxy Statement, and the 2021 Proxy Statement.

402.    Plaintiff, on behalf of Virgin Galactic, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

403.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

404.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

405.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

406.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

407.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Legacy VG (and later the Company) were engaged in the Unsafe Flight Misconduct; (2) as a result of, and as part of, the Unsafe Flight Misconduct, during Legacy VG's February 2019 test flight, Unity's horizontal stabilizer experienced such great damage due to human error that it would take fourteen months to replace, engendering delay; (3) following the destruction of Unity's horizontal stabilizers in February 2019, they were replaced not "upgraded;" (4) the replacement horizontal stabilizers were

made of aluminum rather than composite and as such were inferior; and (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

408.    In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to effect their disclosure, rendering them personally liable to the Company.

409.    Moreover, the SCH Defendants breached their fiduciary duties to the Company by engaging in the Overpayment Misconduct.

410.    In addition, the Individual Defendants—aside from Defendants Bates, Osborne, Reses, and Wong—caused and/or permitted the Company to engage in the Unsafe Flight Misconduct.

411.    Finally, Defendants Branson, Palihapitiya, Kreeger, and Ryans breached their fiduciary duties by engaging in insider sales while the Company's common stock was trading at artificially inflated prices due to the forgoing misrepresentations for collective proceeds of approximately $774 million.

412.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

413.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

414.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Virgin Galactic has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

415.    Plaintiff on behalf of Virgin Galactic has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

416.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

417.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

418.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes the proceeds from insider sales and the unjust compensation paid in connection with the Merger and under the 2019 Plan.

128

419.     Plaintiff, as a shareholder and a representative of Virgin Galactic, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

420.     Plaintiff on behalf of Virgin Galactic has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

421.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

422.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

423.     As a direct and proximate result of the Individual Defendants' abuse of control, Virgin Galactic has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Virgin Galactic has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

424.     Plaintiff on behalf of Virgin Galactic has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

425.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

426.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

427.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Virgin Galactic has sustained and will continue to sustain significant damages.

428.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

429.     Plaintiff, on behalf of Virgin Galactic, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

430.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

431.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

432.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

433.     Plaintiff, on behalf of Virgin Galactic, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier for Contribution Under Sections 10(b) and 21D of the Exchange Act

434. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

435. Virgin Galactic, along with Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Branson's, Palihapitiya's, Whitesides's, Moses's, and Colglazier's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of the Company.

436. Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier, because of their positions of control and authority as controlling shareholder, officers, and/or director of Virgin Galactic, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Virgin Galactic, including the wrongful acts complained of herein and in the Securities Class Action.

437. Accordingly, Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

438. As such, Virgin Galactic is entitled to receive all appropriate contribution or indemnification from Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier.

## EIGHTH CLAIM

### Against the Legacy VG Defendants for Aiding and Abetting
### Breach of Fiduciary Duty

439. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

440. The Legacy VG Defendants aided and abetted the SCH Defendants who breached their fiduciary duties to the Company.

441. The Legacy VG Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

442. Specifically, the Legacy VG Defendants promoted the Merger by issuing false and misleading statements concerning Legacy VG's products, operations, and business prospects. Moreover, the Legacy VG Defendants controlled and operated Legacy VG, the Company's operational predecessor, and caused Legacy VG to jointly issue press releases which contained materially false and misleading statements promoting the Company's future operations and prospects.

443. The Legacy VG Defendants are jointly and severally liable to the same extent as the SCH Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

444. As a direct and proximate result of the Legacy VG Defendants' aiding and abetting of the SCH Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

445. Plaintiff on behalf of Virgin Galactic has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Virgin

Galactic, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to Virgin Galactic the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Virgin Galactic and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Virgin Galactic and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Virgin Galactic to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Virgin Galactic restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

133

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 21, 2022                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>*/s/ Timothy Brown*</u>
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Thomas Spiteri am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

2/21/2022

*Thomas Spiteri*

C13DF4540AC54F8...

Thomas Spiteri