UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE VIRGIN GALACTIC HOLDINGS INC. DERIVATIVE LITIGATION | : MEMORANDUM AND <br> : ORDER <br> : <br> : Lead Case No. 1:22-cv-933 <br>   (OEM)(MMH) |

**MARCIA M. HENRY**, United States Magistrate Judge:

Plaintiffs Thomas Spiteri and Lisa Grenier, shareholders acting derivatively and on behalf of Nominal Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic") f/k/a Social Capital Hedosophia Holdings Corp. ("SCH"), each brought actions in this district against Defendant Richard Branson, founder of Virgin Galactic, and 16 current or former shareholders, directors, or officers of Virgin Galactic, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4 *et seq.* (the "PSLRA"), and related common law claims. *Spiteri v. Branson*, No. 22-CV-933 (OEM)(MMH) (E.D.N.Y.); *Grenier v. Branson*, No. 22-CV-1100 (OEM)(MMH) (E.D.N.Y.). Their actions were later consolidated on consent. *In Re Virgin Galactic Holdings, Inc. Derivative Litig.*, Lead Case No. 22-CV-933 (OEM)(MMH) (E.D.N.Y.) ("the Consolidated Derivative Action").[1]

Before the Court, on referral, is Movant Cody Laidlaw's motion (1) to consolidate his related shareholder derivative action, *Laidlaw v. Branson et al.*, No. 22-CV-5634 (HG) (E.D.N.Y. Sept. 21, 2022) ("*Laidlaw*") with the Consolidated Derivative Action, pursuant to

---

[1] All citations to documents filed on ECF are to the ECF document number (*i.e.*, "ECF No. ___") and pagination "___ of ___" in the ECF header of documents filed in Lead Case No. 22-CV-933, unless otherwise noted.

Federal Rule of Civil Procedure 42(a), and (2) to vacate or amend the Court's May 6, 2022 Order establishing Plaintiffs' counsel leadership structure in the instant action. (Mot., ECF No. 21.)[2] For the reasons stated below, the Court **grants** the motion to consolidate and **denies** the motion to vacate or amend the order establishing the leadership structure.

I.   BACKGROUND

   A.   Factual Allegations[3]

Defendants' alleged unlawful conduct took place from July 10, 2019, through October 14, 2021 (the "Relevant Period"). (Am. Compl., ECF No. 39 ¶ 1.) Virgin Galactic, which came into existence after an October 2019 merger (the "Merger"), is a space tourism company that both conducts space flights and manufactures "space-faring vehicles" and their components. (*Id.* at 1 n.1, ¶ 2.) Before the Merger, Veico 10 Limited ("V10") was the holding company that held Virgin Galactic Vehicle Holdings, Inc., and other affiliated subsidiaries (collectively, "Legacy VG"), thus serving as the operational predecessor of Virgin Galactic. (*Id.* ¶ 3.) V10 owned Legacy VG through its subsidiary, Vieco USA, Inc. (*Id.*) In 2004, Branson, founder of the Virgin Group, partnered with Scaled Composites, an aerospace manufacturing company, to form Legacy VG. (*Id.* ¶¶ 3, 150.)

---

[2] Laidlaw's motion papers include the motion (ECF No. 21) ("Mot."), declaration of Amy Miller (ECF No. 22) ("Miller Decl.") with exhibits (ECF Nos. 22-1 through 22-8) ("Exs. 1, 3–9"), unredacted Laidlaw complaint (ECF No. 23) ("Miller Decl., Ex. 2"), supplemental declaration of Amy Miller (ECF No. 36) ("Miller Suppl. Decl.") with exhibits (ECF Nos. 36-1 through 36-7) ("Exs. 1, 3–8"), and Laidlaw's reply (ECF No. 40) ("Reply"). In opposition, Plaintiffs Spiteri and Grenier's papers include their opposition memorandum (ECF No. 33) ("Opp'n Mem.") and declaration of Timothy Brown and Gregory M. Egleston (ECF No. 32) ("Brown, Egleston Decl.") with exhibits (ECF Nos. 32-1 through 32-2) ("Exs. A–B").

[3] The facts are taken from the operative Amended Complaint in the Consolidated Derivative Action. (*See* Am. Compl., ECF No. 39.)

1. **Defendants**

Plaintiffs allege Defendants' positions with respect to Virgin Galactic in asserting their fiduciary duties. (*Id.* ¶¶ 116–26.) Chamath Palihapitiya was Chairperson of Virgin Galactic's Board from October 2019 until February 17, 2022, and had previously served as the Chairperson and CEO of SCH since May 2017. (*Id.* ¶ 63.) According to the proxy statement SCH filed with the Securities and Exchange Commission ("SEC") on October 10, 2019, Palihapitiya was in one of two directorships in Virgin Galactic, and the other was held by Adam Bain. (*Id.* ¶¶ 65, 80.) Since June 2016, Michael Moses has been President, Space Missions and Safety, of Galactic Enterprises, a wholly owned subsidiary of Virgin Galactic. (*Id.* ¶ 67.) George Whitesides served as Chief Space Officer from July 2020 until February 2021. (*Id.* ¶ 70.) Michael Colglazier has been CEO of Virgin Galactic and a director since July 2020 and President of Virgin Galactic since February 2021. (*Id.* ¶ 73.) Wanda Austin, Craig Kreeger, Evan Lovell, and George Mattson have served as Virgin Galactic directors since October 2019. (*Id.* ¶¶ 77, 87, 92, 95.) Tina Jonas has served as a director since June 2021. (Id. ¶ 84.) James Ryans was a director from October 2019 until February 2021. (*Id.* ¶ 99.) W. Gilbert West has been a director since February 2021. (*Id.* ¶ 103.) Anthony Bates was Vice Chairman of SCH's Board from May 2017 until the Merger, and Ian Osborne was President of SCH from May 2017 until the Merger. (*Id.* ¶¶ 105, 107.) Jacqueline D. Reses and Andrea Wong were SCH directors until the Merger. (*Id.* ¶¶ 110, 113.)

2. **The Merger**

Plaintiffs allege that, in October 2018, Branson and Legacy VG announced plans for the Merger with SCH, which was founded by Palihapitiya as a special purpose acquisition

3

company ("SPAC") in 2017. (*Id.* ¶ 4.)[4] Accordingly, the Merger permitted Virgin Galactic to become a publicly traded company with access to the capital markets and permitted Palihapitiya and his SCH co-investors to benefit financially from their SPAC investments. (*Id.*) The Merger also raised capital for Branson and allowed him to liquidate some of his privately held shares while remaining a controlling shareholder. (*Id.* ¶ 5.)

At the time of the Merger, however, SCH shareholders were unaware that there were major structural and safety issues with the spacecrafts and that Legacy VG was not ready to bring individuals on safe commercial flights into space. (*Id.* ¶ 6.) During the Relevant Period, leading up to the Merger, Defendants told investors that Virgin Galactic was "on the cusp" of sending commercial flights into space despite knowing the truth. (*Id.*)[5]

### 3. Test Flights

On October 31, 2014, while Legacy VG was performing a test flight on one of Scaled Composites' designs, the aircraft disintegrated mid-flight, killing the copilot, seriously injuring the pilot, and leaving a 35-mile-long trail of debris on the ground below. (*Id.* ¶ 9.) Prior to this flight, Legacy VG had sold over 600 tickets for its anticipated commercial space flights. (*Id.*) After this flight, the Federal Aviation Administration ("FAA") investigated and criticized the flight design for not safeguarding against pilot error. (*Id.*) Legacy VG subsequently halted

---

[4] A SPAC is a publicly traded corporation with a two-year life span that is formed solely for the purpose of effecting a merger with a privately held business to enable it to go public. (*Id.* ¶ 4.)

[5] For example, in 2004, Scaled Composites won the Ansari X Prize, a ten-million-dollar award given to the first private organization to launch a reusable crewed vehicle into space twice within two weeks. (*Id.* ¶¶ 7, 151.) Before Scaled Composites won the prize, Branson told the public that he planned to perform tourist flights using Scaled Composites' technology and that Virgin Galactic expected to create 3,000 "astronauts" over a five-year period. (*Id.* ¶ 7.) Safety issues with Scaled Composites' designs came to light in July 2007, but Legacy VG maintained its partnership and moved forward with its plans for space tourism. (*Id.*)

all tickets for commercial space travel and ended its partnership with Scaled Composites. (*Id.* ¶¶ 9–10.) Legacy VG then used The Spaceship Company, which inherited a partially built model spacecraft, VSS Unity ("Unity"), from Scaled Composites in November 2014. (*Id.* ¶¶ 10, 155.) Unity still had safety issues from Scaled Composites' design, but Branson continued to tell investors that Legacy VG would soon be offering commercial flights to space. (*Id.*)

In February 2016, The Spaceship Company finished building Unity. (*Id.* ¶ 11.) Branson planned a "lofty" party for Unity's unveiling and informed investors (including 600 people who had each given him $250,000 ten years before) that they would receive benefits by keeping their Legacy VG investments and that Legacy VG would soon be sending commercial flights into space. (*Id.*) In 2018, it was revealed that Legacy VG and Branson had already spent close to $1 billion, even though commercial space flights were far from a reality. (*Id.* ¶ 12.) On February 22, 2019, Unity completed a trip into space while SCH and Legacy VG were still in Merger discussions. (*Id.* ¶ 15.) During the flight, Unity's horizontal stabilizers were destroyed, but Defendants concealed this destruction from the public and declared the flight a "success." (*Id.*)

### 4. Public Knowledge

Beginning on July 10, 2019, Defendants continued to fail to disclose the existence and extent of the safety problems to investors and instead "caused and/or permitted the Company to issue false and misleading statements about the safety of Unity and its other vehicle prototype, Eve." (*Id.* ¶¶ 16–17.) The deception allowed the Merger to close on terms unreasonable to Virgin Galactic and its shareholders, as Legacy VG's former shareholders would receive the majority of the shares. (*Id.* ¶ 18.) On October 25, 2019, the Merger closed,

5

and Branson and Palihapitiya handpicked former employees to serve on Virgin Galactic's Board and controlled a majority of Virgin Galactic's voting power. (*Id.* ¶ 19.) Beginning in August 2020, Virgin Galactic began pushing back scheduled flights, and on August 3, 2020, Virgin Galactic announced that Branson would not be flying to space in one of its spacecrafts that year, contrary to what investors had previously been told. (*Id.* ¶ 20.) The next day, Virgin Galactic's stock price fell 13.7% per share. (*Id.* ¶ 21.)

On December 12, 2020, Eve and Unity were in the process of embarking on a test flight when Unity's rocket system failed to activate. (*Id.* ¶ 22.) Virgin Galactic had not previously disclosed problems with its spacecrafts to the public, and the media reported Unity's failure on December 12 contemporaneously. (*Id.*) The next trading day, December 14, 2020, Virgin Galactic's share price fell 17.4% per share. (*Id.* ¶ 23.) On February 1, 2021, Virgin Galactic announced that the issue with the December 2020 flight had been fixed and that it would conduct a new test flight that month, which caused the share price to increase. (*Id.* ¶¶ 24–25.) However, later that day, *The Washington Post* published a review of writer Nicholas Schmidle's forthcoming book about Virgin Galactic. (*Id.* ¶ 26.) Schmidle had been embedded at Legacy VG from 2014 until July 2018 to learn about Virgin Galactic, and his book revealed that an issue with the February 2019 flight had nearly killed everyone on board. (*Id.*) After this review, the share price decreased again. (*Id.* ¶ 27.)

### 5. FAA Violations

On February 25, 2021, Virgin Galactic announced, in a press release and on a conference call, that it had inadvertently created problems with Unity's sensors when it remedied the problem with the December 2020 flight. (*Id.* ¶ 29.) During the call, Colglazier would not provide a new launch date and estimated May 2021. (*Id.*) The share price declined

further. (*Id.* ¶ 30.) In May 2021, Virgin Galactic conducted a test flight, and on July 11, 2021, it took Branson into space. (*Id.* ¶¶ 31, 34.) Following the flight's apparent success, Virgin Galactic sold millions of shares for millions of dollars in proceeds. (*Id.* ¶ 35.) However, during the flight, Unity violated FAA regulations by straying outside of its "landing cone," or the volume of space that it was required to stay within to ensure that it returned to the intended landing zone and avoided crashing elsewhere. (*Id.* ¶ 36.) This violation would not become public knowledge until after September 1, 2021, after Virgin Galactic had already sold millions of shares. (*Id.* ¶¶ 37–38.)

For approximately the month of September 2021, the FAA grounded Virgin Galactic's flights until it determined that Virgin Galactic had taken sufficient corrective actions. (*Id.* ¶¶ 38, 40.) On October 14, 2021, Virgin Galactic announced that it would delay any further test flights until late 2022 due to issues with materials used to modify joints on its crafts. (*Id.* ¶ 41.) The price per share fell again after this announcement, and review of internal documents showed that Virgin Galactic management had known of the defects since at least 2018. (*Id.* ¶ 43.) In its August 4, 2022, 10-Q with the SEC, Virgin Galactic revealed that the start of commercial flights would be further delayed, this time until "the second quarter of 2023." (*Id.* ¶ 44.) As a result of this 10-Q, Plaintiffs brought shareholder derivative actions to hold Defendants liable for "their misconduct and disloyal actions, which have harmed Virgin Galactic." (*Id.*)

### B.    Procedural History and Related Actions

Multiple actions have been filed in this district based in whole or in part on the aforementioned allegations.

7

First, on May 28, 2021, a group of plaintiffs initiated a class action against Virgin Galactic Holdings, Inc. and other defendants, alleging violations of the Exchange Act. *See Lavin v. Virgin Galactic Holdings, Inc. et al.*, Case No. 21-CV-3070 (ARR)(TAM) (E.D.N.Y.) (the "Class Action"). In February 2022, Spiteri filed his derivative shareholder action; Grenier filed hers one month later, in March 2022. (*Spiteri* Compl., ECF No. 1; *Grenier* Compl., ECF No. 1.)

On May 4, 2022, the Court entered an Order consolidating Spiteri and Grenier's respective cases, creating the Consolidated Derivative Action, and establishing a plaintiffs' counsel leadership structure. (Consolidation Order, ECF No. 10.)[6] The Court appointed The Brown Law Firm, P.C., Spiteri's attorneys, and Gainey McKenna & Egleston, Grenier's attorneys, as co-lead counsel for Plaintiffs in the Consolidated Derivative Action. (*Id.* ¶ 6.). The Order did not expressly name a lead plaintiff. (*See generally id.*) The Consolidation Order applies "to each derivative case arising out of the same, or substantially the same, transactions or events as alleged in the Consolidated Derivative Action, that is subsequently filed in, removed to, assigned to, or transferred to this Court." (*Id.* ¶ 10.)

Pursuant to a second stipulation by the parties, on July 28, 2022, the Court stayed the Consolidated Derivative Action "until twenty business days following the resolution of any and all motions to dismiss including exhaustion of appeals in [*Lavin*], or any related securities class actions that may be filed." (Stay Order, ECF No. 20 ¶ 1.) The Stay Order specifically referenced the then-pending motion to dismiss in the Class Action as a basis for the stay. (*Id.*

---

[6] The Consolidation Order was signed on May 4, 2022, and filed on May 6, 2022. (Consolidation Order, ECF No. 10.)

at 2.) The stay would not apply to any motions to consolidate any subsequently filed shareholder derivative actions (*i.e.*, *Laidlaw*) related to the actions already filed. (*Id.* ¶ 4.) The Stay Order also permitted Plaintiffs to file one consolidated amended complaint during the stay. (*Id.* ¶ 11.)

Meanwhile, Laidlaw filed his derivative action in September 2022. (*Laidlaw* Compl., ECF No. 1.) The *Laidlaw* complaint alleges similar facts as the Consolidate Derivative action complaint and raises claims against Branson, Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, Palihapitiya, Ryans, West, and Whitesides, who are all also defendants in the Consolidated Derivative Action. (*Compare* Miller Decl., Ex. 2, ECF No. 23-1, *with* Am. Compl., ECF No. 39.) The *Laidlaw* complaint alleges breach of fiduciary duty, unjust enrichment, contribution and indemnification, and violation of Section 14(a) of the Exchange Act stemming from unlawful conduct from 2019 through 2021. (Miller Decl., Ex. 2, ECF No. 23-1 ¶¶ 1, 226–31.)

Further, in December 2022, Plaintiffs filed their Amended Complaint, the operative complaint in the Consolidated Derivative Action. (Am. Compl., ECF No. 39.) In the Amended Complaint, Plaintiffs raise claims against Branson, Moses, and Whitesides for aiding and abetting breaches of fiduciary duty by Palihapitiya, Bain, Bates, Osborne, Reses, Ryans, and Wong. (*Id.* at 1–2.) Plaintiffs allege that all these defendants, except Moses, violated Section 14(a) of the Exchange Act. (*Id.* at 2.) Plaintiffs raise contribution claims against Branson, Palihapitiya, Whitesides, Moses, and Colglazier under Sections 10(b) and 21D of the Exchange Act. (*Id.*) In particular, Plaintiffs allege that all Defendants (except for Bates, Osborne, Reses, and Wong) caused or permitted the operation of flights that they knew or were reckless in not knowing were unsafe and allege specific actions and defects that these

9

defendants knew, or should have known, about. (*Id.* ¶ 45.) Defendants all breached their fiduciary duties by personally making or causing Virgin Galactic to make materially false and misleading statements regarding Virgin Galactic's flight issues and safety risks and failed to correct these statements. (*Id.* ¶ 46.) Palihapitiya, Bain, Bates, Osborne, Reses, Ryans, and Wong breached their fiduciary duties by agreeing to the Merger on terms unreasonable considering the truth of Legacy VG's state of affairs, and Branson, Moses, and Whitesides aided and abetted these breaches by permitting them to breach and failing to correct false and misleading statements. (*Id.* ¶¶ 48–49; *see id.* ¶¶ 127–30.)

### C.  The Instant Motion

In October 2022, Laidlaw moved to consolidate *Laidlaw* with the Consolidated Derivative Action and to vacate or amend the existing leadership structure. (Mot., ECF No. 21.) The motion was referred to the undersigned. (Oct. 18, 2022 Order.)[7] Plaintiffs oppose the motion, except as to the request for consolidation. (Opp'n Mem., ECF No. 33 at 6–19.) Laidlaw replied in support of his motion. (Reply, ECF No. 40.)

## II.  DISCUSSION

### A.  Consolidation

A court may consolidate actions that "involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2); *see also Reitan v. China Mobile Games & Ent. Grp., Ltd.*, 68 F. Supp. 3d 390, 393–94 (S.D.N.Y. 2014) (citing *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990)). "The district court has broad discretion to determine whether consolidation is appropriate." *Brady v. Top Ships Inc.*, 324 F. Supp. 3d 335, 343 (E.D.N.Y. 2018) (citing

---

[7] The Consolidated Derivative Action was reassigned from the Honorable LaShann DeArcy Hall to the Honorable Orelia E. Merchant on July 28, 2023.

*Johnson*, 899 F.2d at 1285). Consolidation is a "valuable and important tool of judicial administration" that should be "invoked to expedite trial and eliminate unnecessary repetition and confusion.'" *Reitan*, 68 F. Supp. 3d at 394 (quoting *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (cleaned up)). Accordingly, courts consider the following factors to determine whether consolidation is appropriate:

> Whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Brady*, 324 F. Supp. 3d at 343 (citing *Johnson*, 899 F.2d at 1285 (cleaned up)).

The Court finds that consolidation is warranted because *Laidlaw* and the Consolidated Derivative Action involve common questions of law and fact. Notably, both complaints allege the same causes of action against many of the same defendants based on identical alleged misconduct by Defendants in their roles in relation to Virgin Galactic over the same period of time, 2019 through 2021. (*See generally* Am. Compl., ECF No. 39; Miller Decl., Ex. 2, ECF No. 23-1.) In particular, both complaints allege that Defendants, by virtue of their leadership roles within Virgin Galactic, mislead the public and the shareholders by overstating Virgin Galactic's preparedness for commercial space flights, concealing material issues with safety that affected the viability of the company, and taking advantage of their inside knowledge by selling millions of shares for enormous profits. (*See generally* Am. Compl., ECF No. 39; Miller Decl., Ex. 2, ECF No. 23-1.) They both reference FAA violations, exposure by Schmidle, and Defendants' repeated assurances to investors that their investments were safe and fruitful. (*See id.*) Thus, the complaints allege Defendants breached the same fiduciary

duties (as directors and officers) to Virgin Galactic through the same misconduct (concealing material information regarding the same flights, using inside information to sell millions of shares) that caused the same harm (financial harm to shareholders).

Although the defendants are not identical, there is substantial overlap,[8] which courts have found sufficient for consolidation. *See Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, 299 F.R.D. 1, 6 (E.D.N.Y. 2014) (consolidating cases with almost identical parties where no parties objected). "Absent prejudice to the defendants, '[c]onsolidation of multiple actions alleging securities fraud is appropriate where those actions relate to the same public statements and reports[.]'" *Parot v. Clarivate Plc*, No. 22-CV-1371 (ARR)(RLM), 2022 WL 1568735, at *3 (E.D.N.Y. May 18, 2022) (citing *Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 204 (E.D.N.Y. 2019)); *see also In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20-CV-4420 (PAE), 2020 WL 5548856, at *3 (S.D.N.Y. Sept. 16, 2020) (approving consolidation of two actions where "the majority of each Complaint contains the exact same allegations, generally verbatim"). The Court finds no prejudice here, where Defendants can efficiently respond to the nearly identical allegations in a consolidated action. *Reitan*, 68 F. Supp. 3d at 394.

Additionally, consolidation is appropriate where, as here, Spiteri, Grenier, and Laidlaw support consolidation and no defendants have opposed it. *See Parot*, 2022 WL 1568735, at *4 (approving consolidation where all movants expressed their support and no defendants

---

[8] Defendants in the Consolidated Derivative Action are Branson, Moses, Whitesides, Palihapitiya, Bain, Bates, Osborne, Reses, Ryans, Wong, Colglazier, Austin, Jonas, Kreeger, Lovell, Mattson, and West. (*See* Am. Compl., ECF No. 39.) Defendants in *Laidlaw* are Branson, Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, Palihapitiya, Ryans, West, and Whitesides. (*See* Miller Decl., Ex. 2, ECF No. 23-1.) Thus, the named defendants are the same, except the Consolidated Derivative Action names additional defendants Moses, Bates, Osborne, Reses, and Wong.

oppose); *Brady*, 324 F. Supp. 3d at 343–44 (same); *Endress v. Gentiva Health Servs., Inc.*, 278 F.R.D. 78, 82 (E.D.N.Y. 2011) (noting that defendants' lack of objection to consolidation bolsters finding that consolidation would not prejudice defendants).

For the reasons above, *Laidlaw* and the Consolidated Derivative Action present common questions of law and fact, and consolidation would serve the interests of judicial economy without prejudice to Defendants. Accordingly, the motion to consolidate is granted.

### B. Vacatur or Amendment of the Stay Order

Under the law of the case doctrine, a district court's discretion to reconsider its own decisions is limited "to circumstances in which new evidence is available, an error must be corrected, or manifest injustice would otherwise ensue, unless there is an intervening change in law." *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581 (VEC), 2020 WL 1272285, at *3 (S.D.N.Y. Mar. 17, 2020) (citing *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44 (2d Cir. 2005)) (cleaned up). Additionally, "[a] court has broad discretion in deciding whether to lift the stay, which arises out of its inherent power to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 50 (S.D.N.Y. 2019) (cleaned up). A court should consider "if the circumstances that persuaded the court to impose the stay in the first place have changed significantly." *Id.* (cleaned up).

Here, the Court declines to vacate the Stay Order. Spiteri and Grenier proposed the stay of the Consolidated Derivative Action because their claims against Defendants related to the claims asserted in the Class Action, where a motion to dismiss was pending. (Stay Order,

13

ECF No. 20 at 2.) The parties and Court agreed that a stay would be "in the interests of judicial economy and conserving the resources of the Parties and the Court." (*Id.*) This is still true.

Plaintiffs correctly assert that there has been "no change in controlling law, new evidence or manifest error of law that would justify reconsideration of the Consolidation and Appointment Order." (Opp'n, ECF No. 33 at 9.) The Stay Order provided, "The Consolidated Derivative Action (including all discovery) shall be stayed until twenty business days following the resolution of any and all motions to dismiss including exhaustion of appeals in the Class Action, or any related securities class actions that may be filed." (*Id.* at 3.) By the Stay Order's terms, the pending motion to dismiss in the Class Action has not yet been fully resolved. (*Lavin*, Mot. for Reconsideration, ECF No. 93.) The Class Action court disposed of some but not all claims in the two motions to dismiss already filed in that case. (*Lavin*, Order on 1st Mot. to Dismiss, ECF No. 58; *Lavin*, Order on 2d Mot. to Dismiss, ECF No. 90.) However, the Class Action plaintiffs have moved for reconsideration, certification for interlocutory appeal, or entry of final judgment. (*Lavin*, Mot. for Reconsideration, ECF No. 93.) The language of the Stay Order specifies that the resolution of motions to dismiss includes "exhaustion of appeals in the Class Action." (Stay Order, ECF No. 20 at 3.) Thus, the conditions triggering the vacatur of the Stay Order have not happened, and the stay remains.

Furthermore, Plaintiffs are correct in stating that "the resolution of the motion to dismiss in the Class Action will necessarily impact the proceedings in the Consolidated Derivative Action by simplifying overlapping issues and promoting judicial efficiency." (Opp'n Mem., ECF No. 33 at 11.) As discussed previously, the Court stayed the case in part "to avoid potentially duplicative actions and to prevent any waste of the Court's and the Parties' resources." (Stay Order, ECF No. 10 at 4.) For example, a ruling on the pending

14

motion in *Lavin* could affect the active parties and claims in the Consolidated Derivative Action and in *Laidlaw*, if certain parties or claims are dismissed. This is the same legal landscape that existed when the Court entered the stay. Thus, for the Court to exercise its discretion in lifting the stay now, Laidlaw would need to show that the circumstances that persuaded the Court to enter the stay have changed significantly. *Commodities & Mins. Enter.*, 423 F. Supp. at 50.

And Laidlaw has not made such a showing. Indeed, Laidlaw does not squarely address these points. Instead, he merely argues that the Court has the power to alter its own orders and that changing the leadership structure would provide the shareholders with "zealous, capable advocacy." (Reply, ECF No. 40 at 7–8.) While the Court does have discretion to modify its own orders, the Court stayed the Consolidated Derivative Action because of the likely effects that resolution of a motion to dismiss in the Class Action would have on this action. The fact that Class Action Plaintiffs' motion has not been completely resolved yet dissuades the Court from finding that circumstances have changed significantly enough to warrant lifting the stay. For example, the *Lavin* Court granted the second motion to dismiss, *inter alia*, Section 10(b) claims against Palihapitiya and Branson. (*Lavin*, Order on 2d Mot. to Dismiss, ECF No. 90 at 61–62.) On reconsideration, the *Lavin* Court is again visiting the merits of these claims, the disposition of which could change and materially alter the legal landscape of the present action. In light of the foregoing, the Court finds that lifting the stay order is not warranted.[9]

---

[9] The Court therefore declines to reach Laidlaw's arguments for vacating or amending the order establishing leadership structure.

### III. CONCLUSION

For the foregoing reasons, the motion to consolidate is **granted** and the motion to vacate or amend the leadership structure order is **denied**.

**SO ORDERED.**

Brooklyn, New York
September 30, 2023

                                              /s/Marcia M. Henry
                                              MARCIA M. HENRY
                                              United States Magistrate Judge